670 F.2d 1369
 UNITED STATES of America, Plaintiff-Appellee,
v.
16.92 ACRES OF LAND, etc., Defendant,
Appeal of William C. BREWER.
UNITED STATES of America, Plaintiff-Appellee,
v.
65.60 ACRES OF LAND, LOCATED IN the TOWN OF RUSSELL, COUNTY
OF BAYFIELD, et al., Defendants-Appellants.
 Nos. 81-1190, 81-1484.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 26, 1982.
Decided Feb. 16, 1982.
 
 Bradley G. Clary, St. Paul, Minn., James F. Lorimer, Madison, Wis., for defendants-appellants.
 Martin W. Matzen, Dept. of Justice, Washington, D. C., for plaintiff-appellee.
 Before CUMMINGS, Chief Judge, PELL and SPRECHER, Circuit Judges.
 PER CURIAM.
 
 
 1
 This is a consolidated appeal from judgments entered in favor of the United States in actions to condemn certain real property owned by the appellants. We have been asked to address two issues: (1) whether the United States has the authority to acquire land by condemnation in order to create the Apostle Islands National Lakeshore; and (2) whether the "improved property" classification established by 16 U.S.C. § 460w-3 violates the equal protection of law guarantee encompassed in the Fifth Amendment. For the reasons discussed in this opinion, we affirm the judgments of the district court.
 
 I.
 
 2
 On September 27, 1970, Congress established the Apostle Islands National Lakeshore. See Pub.L. 91-424, 84 Stat. 880, 16 U.S.C. § 460w (1970). The Lakeshore was to be comprised of both mainland property and several islands, all located on or near the Wisconsin shoreline of Lake Superior. The Secretary of Interior was given the authority to acquire land located within the boundaries of the Lakeshore area. Since 1970, Congress has authorized $5,250,000 to be appropriated for the acquisition of land within the Lakeshore area. See 16 U.S.C. § 460w-7 (1974).
 
 
 3
 The appellants in these consolidated appeals are owners of real property located within the Lakeshore area. The United States brought successful actions in district court to condemn their respective property interests. On appeal, the appellants contest the Secretary of Interior's authority to condemn their property.
 
 
 4
 Appellant William Brewer raises an additional issue before this Court. Congress granted a limited right of use and occupancy to landowners who had "improved" their property prior to January 1, 1967. In July of 1968, Brewer commenced construction of a detached, noncommercial residential building on his previously unimproved tract of land. Brewer's "improvement" did not meet the January 1, 1967 cutoff date set by Congress for "improvements." Thus, in addition to the issue regarding the Secretary's authority to condemn land, Brewer asserts that the cutoff date violates his right to equal protection under the law. He argues that he should be entitled to the same rights of use and occupancy afforded to those landowners whose property had been improved prior to January 1, 1967.
 
 II.
 
 5
 The Act establishing the Apostle Islands National Lakeshore neither authorizes nor forbids the acquisition of land by condemnation. The Lakeshore acquisition statute provides in pertinent part:
 
 
 6
 The Secretary may acquire within the boundaries of the lakeshore lands and interests therein by donation, purchase with donated or appropriated funds, or exchange, but lands and interests in lands owned by the State of Wisconsin may be acquired only by donation. * * *
 
 
 7
 16 U.S.C. § 460w-2.
 
 
 8
 The Government, however, relies upon the General Condemnation Act of August 1, 1888, as amended, 40 U.S.C. § 257, to provide it with the necessary statutory authority to condemn the appellants' properties. The material portion of 40 U.S.C. § 257 reads as follows:
 
 
 9
 In every case in which the Secretary of the Treasury or any other officer of the Government has been, or hereafter shall be, authorized to procure real estate for the erection of a public building or for other public uses, he may acquire the same for the United States by condemnation, under judicial process, whenever in his opinion it is necessary or advantageous to the Government to do so * * *
 
 
 10
 The crux of the appellants' argument is that had Congress desired the Secretary to have the power of condemnation in order to acquire property for the National Lakeshore, it would have specifically provided for it in 16 U.S.C. § 460w-3. Considering the nature of eminent domain, as well as the plain language of 40 U.S.C. § 257, we can only conclude that the appellants' argument must fail.
 
 
 11
 There is little doubt that the power of eminent domain is an attribute of sovereignty. The taking of private property for public use upon just compensation is so often necessary for the proper performance of governmental functions that the power is deemed to be essential to the life of the government. Georgia v. City of Chattanooga, 264 U.S. 472, 480, 44 S.Ct. 369, 370, 68 L.Ed. 796 (1924). Every person who acquires or occupies land does so at the risk of being evicted by the exercise of the superior right of the government or its delegate to acquire his interest upon payment of just compensation. Green Street Association v. Daley, 373 F.2d 1, 6 (7th Cir.), cert. denied, 387 U.S. 932, 87 S.Ct. 2054, 18 L.Ed.2d 995 (1967). This power of condemnation is coextensive with the government's power to purchase. United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 554, 66 S.Ct. 715, 718, 90 L.Ed. 843 (1946).
 
 
 12
 It has been uniformly held that authority to acquire real property conferred by the enactment of a statute after the Act of August 1, 1888, 40 U.S.C. § 257, carries with it the power to condemn.[1] Thus, unless it desires to exclude condemnation, there is no need for Congress to specifically include "condemnation" as a permissible method of property acquisition in a statute.[2] Our Court recognized this principle several years ago in United States v. Advertising Checking Bureau, Inc., 204 F.2d 770 (7th Cir. 1953). There, the authority of the Government to condemn property in order to house a federal agency was affirmed on the basis of 40 U.S.C. § 257. Commenting on the lack of necessity for specific authorization to condemn property in a procurement statute, this Court stated:
 
 
 13
 As authority (has) already been conferred to procure real estate for public uses by condemnation, it would seem to (be) quite unnecessary to embody in this Act specific authority to acquire real estate by condemnation proceedings. We must assume that Congress had full knowledge of the Act of August 1, 1888 and of the interpretation that (has) been placed upon it by the courts.
 
 
 14
 United States v. Advertising Checking Bureau, Inc., supra, 204 F.2d at 772, quoting Barnidge v. United States, 101 F.2d 295, 297-98 (8th Cir. 1939).
 
 
 15
 While donation, purchase, or exchange may be preferred methods of acquisition, they are not the only methods which the government may employ to acquire the appellants' properties. There is nothing in either 16 U.S.C. § 460w-2[3] or its legislative history[4] to suggest that the government does not have the power of condemnation. Without limiting language from Congress, we must conclude that the Secretary of Interior has implicit authority to condemn the appellants' properties.
 
 III.
 
 16
 As a condition of government acquisition of property, Congress granted to certain private landowners in the Lakeshore area the right to retain a limited interest in their property. 16 U.S.C. § 460w-3 provides in pertinent part:
 
 
 17
 (a) With the exception of not more than eighty acres of land to be designated within the lakeshore boundaries by the Secretary as an administrative site, visitor center, and related facilities, as soon as practicable, any owner or owners of improved property on the date of its acquisition by the Secretary may, as a condition of such acquisition, retain for themselves and their successors or assigns a right of use and occupancy of the improved property for noncommercial residential purposes for a definite term not to exceed twenty-five years, or, in lieu thereof, for a term ending at the death of the owner, or the death of his spouse, whichever is the later. The owner shall elect the term to be reserved. The Secretary shall pay to the owner the fair market value of the property on the date of such acquisition less the fair market value on such date of the right retained by the owner.
 
 
 18
 (c) The term "improved property," as used in this section, shall mean a detached, noncommercial residential dwelling, the construction of which was begun before January 1, 1967 (hereinafter referred to as "dwelling"), together with so much of the land on which the dwelling is situated, the said land being in the same ownership as the dwelling, as the Secretary shall designate to be reasonably necessary for the enjoyment of the dwelling for the sole purpose of noncommercial residential use, together with any structures accessory to the dwelling which are situated on the land so designated.
 
 
 19
 Appellant William Brewer acquired 16.92 acres of unimproved Lakeshore property on September 5, 1966. In July of 1968, Brewer commenced construction of a detached, noncommercial residential dwelling on his property. Had construction of this dwelling begun prior to January 1, 1967, it is undisputed that Brewer would have come within the coverage of 16 U.S.C. § 460w-3. However, because Brewer did not meet the January 1, 1967 deadline, he was denied the opportunity to retain a limited interest in his property.[5] Brewer claims that the "unimproved property" classification established by 16 U.S.C. § 460w-3 violates the equal protection of law guarantee encompassed in the Fifth Amendment.[6]
 
 A.
 
 20
 The first step in our analysis is to determine the standard by which we will evaluate 16 U.S.C. § 460w-3. This requires an examination of the nature of Brewer's property interests.
 
 
 21
 Brewer argues that the freedom to use and enjoy one's property is a fundamental right and that any restrictions upon this right should be subject to the strictest of scrutiny. Such a standard would require the Government to clearly show that use of the January 1, 1967 deadline is necessary to promote or protect a compelling and substantial government interest. However, it is undisputed that the right to enjoy one's property is subject to the legitimate exercise of eminent domain by the government. We thus agree with the district court that strict scrutiny is not the proper standard to use to evaluate the constitutionality of the cutoff date.
 
 
 22
 It is axiomatic that property rights are not absolute; for a government cannot exist if a citizen may at will use his property to the detriment of others. Nebbia v. New York, 291 U.S. 502, 523, 54 S.Ct. 505, 509, 78 L.Ed. 940 (1934). See Pruneyard Shopping Center v. Robins, 447 U.S. 74, 84-85, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980). As we have previously noted, every person who acquires land does so at the risk of being evicted by the exercise of the superior right of the government to acquire his interest upon payment of just compensation. Green Street Association v. Daley, supra, 373 F.2d at 6. It is equally clear that the government, once given the proper authority, may condemn total or partial interests in property. See United States v. General Motors Corp., 323 U.S. 373, 380, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945). The right to use and enjoy property is clearly subject to the government's right of eminent domain. With these factors in mind, we conclude that property interests are protected by the equal protection guarantee to the extent that legislative classifications cannot adversely affect the property interests of a class unless the classification is rationally related to a legitimate legislative goal. Ohio Inns, Inc. v. Nye, 542 F.2d 673, 680 (6th Cir. 1976), cert. denied, 430 U.S. 946, 97 S.Ct. 1583, 51 L.Ed.2d 794 (1977). See Village of Belle Terre v. Borass, 416 U.S. 1, 7-8, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797 (1974).
 
 
 23
 This rational-basis standard has been described as a relatively relaxed standard reflecting an awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976). The problems of government are practical ones and may justify, if they do not require, rough accommodations-illogical, it may be, and unscientific. Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69-70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913). These accommodations by the legislature will not be set aside if any state of facts reasonably may be conceived to justify them. McGowen v. Maryland, 336 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).
 
 B.
 
 24
 The procedure that allows certain land owners to retain a limited interest in their condemned property was described in Lakeshore legislative history as "customary in ... recreation-oriented authorizations." H.R.Rep.No.91-1280, 91st Cong., 2d Sess. 6, reprinted in (1970) U.S.Code Cong. & Ad.News 3909, 3913. This procedure is known, and was referred to in the Senate hearings on the Lakeshore bill, as the "Cape Cod formula." See Apostle Islands National Lakeshore: Hearings on S. 778 Before the Subcomm. on Parks and Recreation of the Senate Comm. on Interior and Insular Affairs, 90th Cong., 1st Sess. 37 (1967) (Comment by Senator Bible) (hereinafter cited as 1967 Hearings ).[7]
 
 
 25
 While the legislative history of the Lakeshore Act is for the most part silent as to the rationale behind the use of the "Cape Cod formula," the legislative history of the Cape Cod Act itself is of some guidance.[8] It reveals that the "Cape Cod formula" attempts to lessen the burden of condemnation for private landowners who have developed their property, while at the same time attempting to guarantee maximum access of undeveloped lands to the public. See S.Rep.No.428, 87th Cong., 1st Sess. 27, reprinted in (1961) U.S.Code Cong. & Ad.News 2212, 2235. Use of the cutoff date enables the government to ascertain from a certain date exactly which property will be subject to immediate and total condemnation. Id. at 26-27, (1961) U.S.Code Cong. & Ad.News at 2235. A cutoff date also prevents anticipatory construction of residential buildings by owners of undeveloped property. Cf. id. at 25 (1961) U.S.Code Cong. & Ad.News at 2233 (the Cape Cod Act provides that a cutoff date shall also apply to the date of the acquisition of property to prevent fraudulent conveyances to children). Finally, a cutoff date discourages construction of buildings for the purpose of adding value to the property which the government, and not the landowner, ultimately must bear. 1967 Hearings, supra at 252 (Comment by Senator Moss).
 
 
 26
 The above factors indicate that a reasonable basis does exist for establishing a retrospective cutoff date to determine whether a limited property interest may be retained by an owner of property. It is not for us, in this case, to question the wisdom of the exact date of the cutoff. Justice Holmes perhaps put the point best when he stated:
 
 
 27
 When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked upon by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark. Louisville Gas & Electric Co. v. Coleman, 277 U.S. 32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770 (1928) (dissenting opinion).
 
 
 28
 The January 1, 1967 cutoff date cannot be said to be very wide of any reasonable mark.[9] For this reason, we conclude that it was within the discretion of Congress to establish January 1, 1967 as the cutoff date for "improved" property. As such, 16 U.S.C. § 460w-3 does not violate the equal protection guarantee encompassed in the Fifth Amendment.
 
 IV.
 
 29
 For the reasons discussed in this opinion, the decisions of the district court are hereby AFFIRMED.
 
 
 
 [1]
 See Albert Hanson Lumber Co. v. United States, 261 U.S. 581, 587, 43 S.Ct. 442, 444, 67 L.Ed. 809 (1923); United States v. 365.0 Acres of Land, Etc., Augusta Co., Va., 428 F.2d 459, 460 (4th Cir. 1970); Swan Lake Hunting Club v. United States, 381 F.2d 238, 241 (5th Cir. 1967); United States v. Kennedy, 278 F.2d 121, 127 (9th Cir. 1960); United States v. Advertising Checking Bureau, Inc., 204 F.2d 770, 772 (7th Cir. 1953); Barnidge v. United States, 101 F.2d 295, 297-98 (8th Cir. 1939); United States v. 0.37 Acres of Land in Cty. of Flathead, Etc., 414 F.Supp. 470, 472 (D.Mont.1976)
 
 
 [2]
 An example where Congress specifically ruled out condemnation as a method of property acquisition is found in the Hells Canyon National Recreation Area Act, 16 U.S.C. § 460gg (1975). In this Act, the Secretary was authorized to purchase land "with donated or appropriated funds with the consent of the owner, (by) donation, or exchange." 16 U.S.C. § 460gg-6(a) (emphasis added). See also 16 U.S.C. § 410z (1980) (Boston National Historical Park Act)
 
 
 [3]
 The appellants argue that the plain language of 16 U.S.C. § 460w-2, with its omission of the word "condemnation," suggests that the government may acquire land only by exchange, donation, or voluntary purchase. However, we note that in 16 U.S.C. § 460w-2, Congress specifically ruled out condemnation of property owned by the State of Wisconsin, thereby creating an implication that no such provision was intended for private property
 
 
 [4]
 Despite appellants' argument to the contrary, we, like the district court, find the legislative history and the colloquies that took place before the Senate Subcommittee to be of little assistance in resolving this issue. If anything, these records indicate that the power of condemnation was viewed by the Senate as a necessary method of land acquisition. See Apostle Islands National Lakeshore: Hearings on S. 778 Before the Subcomm. on Parks and Recreation of the Senate Comm. on Interior and Insular Affairs, 90th Cong., 1st Sess. 41 (1967)
 
 
 [5]
 Prior to trial, the Government wrote two letters to Brewer offering him the opportunity to retain a life interest in his property. Brewer turned down these offers. The Government argues that Brewer no longer has standing to challenge 16 U.S.C. § 460w-3 because he was offered exactly the same limited interest in his property as was offered landowners whose property fell within the definition of "improved property." However, the Government stated at oral argument that negotiations are no longer going on between Brewer and the United States. In light of this fact and after considering the express terms of 16 U.S.C. § 460w-3, we conclude, for purposes of this appeal, that Brewer has the necessary standing to challenge 16 U.S.C. § 460w-3
 
 
 [6]
 The Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws. Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954)
 
 
 [7]
 It was the Cape Cod National Seashore Act which for the first time allowed owners of "improved" property to retain a limited interest in their condemned property. See Pub.L. 87-126, 75 Stat. 284, 16 U.S.C. § 459b (1961)
 
 
 [8]
 We are not limited in our analysis to the legislative history of the Lakeshore Act. Because Congress relied on a procedure established in a previous act, we may infer that the rationale behind the prior scheme is applicable to the Lakeshore Act as well. See Trafelet v. Thompson, 594 F.2d 623, 626-27 (7th Cir.), cert. denied, 444 U.S. 906, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979)
 
 
 [9]
 The original Apostle Islands National Lakeshore bill, proposed by Senator Nelson in 1965, had a cutoff date of January 1, 1965. See S. 2498, 89th Cong., 1st Sess. (1965). The Lakeshore bill was proposed again in 1967; this time with a January 1, 1967 cutoff date. See S. 778, 90th Cong., 1st Sess. (1967). This bill was passed unanimously by the Senate on August 21, 1967. The final bill, which was enacted in 1970, retained the 1967 cutoff date. See H.R. 9306, 91st Cong., 2d Sess. (1970); S. 621, 91st Cong.2d Sess. (1970). Why a 1970 cutoff date was not incorporated into the Act is uncertain. However, because there are rational reasons for the use of a retrospective cutoff date, that January 1, 1970 may have been a less onerous date does not invalidate the 1967 cutoff. Congress chose to retain the 1967 cutoff, and this mark does not appear to be wide of any reasonable mark