In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-2708

SHAHID SHAIKH,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO, JULIA STASCH,
and DAVID SALTZMAN,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 4235—**Matthew F. Kennelly**, *Judge.*

ARGUED APRIL 18, 2003—DECIDED AUGUST 25, 2003

Before EASTERBROOK, KANNE, and DIANE P. WOOD,
*Circuit Judges.*

KANNE, *Circuit Judge.* Plaintiff Shahid Shaikh (an East-
Asian Muslim, born in India, now a U.S. citizen and
Connecticut resident) outbid his competitors at a public
auction and entered into a purchase agreement with the
U.S. Department of Housing and Urban Development to
buy the Lowe Avenue Terrace Apartments—an apartment
building located at 6531 South Lowe Avenue in Chicago,
Illinois. HUD had acquired the building through foreclo-
sure proceedings. Before the closing, the City of Chicago
(acting through its then-Commissioner of the Department
of Housing, Julia Stasch, and then-Deputy Commissioner

of the Department of Housing, David Salzman) attempted repeatedly to persuade both HUD and Shaikh to cancel their purchase agreement. The City had sought to acquire the Lowe apartments for a possible expansion of the Kennedy-King City College campus, located a few blocks away at 6800 South Wentworth Avenue. To that end, the City had informed both HUD and Shaikh that it was considering condemning the property. HUD held to its agreement, but ultimately Shaikh withdrew after the City further offered him $20,000 to recoup his out-of-pocket expenses.

With Shaikh out of the picture, HUD offered the property to the second-highest bidders at the auction, John Schlick and David Horn (two Caucasian, non-Muslim residents of Washington, D.C.). The City once again tried to convince HUD and the potential buyers to withdraw, informing Schlick and Horn of its intention to take the property by eminent domain. This time though, HUD refused to allow Schlick and Horn to back out of their agreement.

After the sale had completed, the City never used its powers of eminent domain to acquire the property from Schlick and Horn nor did it proceed with the Kennedy-King campus relocation or expansion plans. It also reneged on its offer to pay Shaikh $20,000 for his expenses. Shaikh then brought this action against the City, Stasch, and Salzman, arguing that in causing him to withdraw from his purchase agreement with HUD, the defendants (hereinafter collectively referred to as the City) intentionally discriminated against him on account of his race and nationality in violation of 42 U.S.C. § 1981 (which prohibits discrimination in contractual relations) and 42 U.S.C. § 1982 (which prohibits discrimination in the sale of property) and violated 42 U.S.C. § 1983 by depriving him of equal protection under the law and by imped-

ing his substantive-due-process rights and his right to travel.[1]

The district court granted summary judgment to the City on Shaikh's §§ 1981 and 1982 claims and his equal-protection, right-to-travel, and substantive-due-process claims under § 1983, finding that Shaikh could neither prove that the City treated similarly situated individuals outside his protected class (whether based on race, nationality, or citizenship) more favorably than he was treated nor that the City's stated reason for persuading Shaikh to cancel his contract (the Kennedy-King college expansion) was either illegitimate or pretextual. It also rejected Shaikh's "class of one" equal-protection argument because Shaikh failed to produce any evidence that tended to suggest that the City had a personal vendetta against him. Shaikh appeals.

Although in the final analysis we agree with the district court that the City behaved as inefficiently, irrationally, and for that matter impolitely, in trying to convince Shaikh not to proceed with the Lowe-apartments purchase as it did in trying to dissuade Schlick and Horn or any other potential purchaser without regard to preferences of race, nationality, citizenship, or personality, Shaikh's §§ 1981 and 1982 claims fail for a more fundamental reason: Because the City had no power directly to affect HUD's proposed sale of the property to Shaikh, it did not unlawfully or unconstitutionally impede upon Shaikh's ability to purchase the building. More fundamentally still, the possibility that the City would seek to take the Lowe apartments by eminent domain is a risk every private property owner bears, but it is a risk balanced by

---

[1] Shaikh's original complaint advanced four additional counts under the Fair Housing Act. 42 U.S.C. §§ 3601 *et seq.* (2003). Those claims were previously dismissed by the district court in a ruling that is not challenged here.

constitutional requirements to take the property only for the public use and then to compensate the owner for the property's fair market value. And Shaikh has not presented any theory that would allow him to recover under §§ 1981 or 1982 for the City providing him with advance notice of its intent to exercise that power within those constitutionally mandated limits.

The City did not own the Lowe apartment building—HUD did—and so the City could not refuse to sell it to Shaikh. HUD had acquired the property by foreclosing on a Federal Housing Authority administered loan and, under the terms of the Multifamily Property Disposition Reform Act of 1994, it had informed the City of its acquisition. 12 U.S.C. § 1701z-11(c)(3)(A) (2003). At that time, the City took no action to acquire the property, even though the statute grants the City a right of first refusal. *See id.* at § 1701z-11(i). When the City later changed its mind and informed HUD of its interest in the property for the Kennedy-King expansion, it was too late: HUD had decided to proceed to auction. At this point, the City was powerless to stop the auction sale. The Act afforded them no further opportunity to lay claim to the property after they had passed on their right of first refusal. And under the Supremacy Clause, the City could not pursue condemnation proceedings against HUD to obtain the property in advance of, and for the purpose of cancelling, the auction. *See Utah Power & Light Co. v. United States*, 243 U.S. 389, 404-05 (1917) (holding that private rights in public lands of the United States within a state cannot be acquired under the state's power of eminent domain, unless Congress confers that right).

Unable to prevent HUD from proceeding to auction and eventual sale, the City redirected its persuasive efforts towards the successful bidder, Shaikh. After the auction, Shaikh and HUD entered into a purchase agreement for the property. For the same reasons discussed above, the

City lacked leverage over HUD to get it to break its bargain with Shaikh (although that didn't stop it from urging HUD to adhere strictly to the purchase agreement and not to overlook any technical violations by Shaikh). Instead, it tried to convince Shaikh to back out of the deal, "threatening" him with condemnation proceedings. This, Shaikh suggests, was unconstitutional and unlawful conduct if motivated by discriminatory animus.

We disagree. To succeed on this theory under §§ 1981 and 1982, Shaikh must argue that advance notice of a local government's intent to use its eminent-domain power can constitute unlawful interference with his contractual rights and otherwise make unavailable or deny him the opportunity to purchase the target property. *See Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996) (holding that to succeed on a § 1981 or a § 1982 claim, a plaintiff must allege, *inter alia*, intentional discrimination concerning the making and enforcing of a contract or the sale or lease of real property). Shaikh is correct in noting that a third party's interference with an individual's equal opportunity to enter into contracts or purchase property can support civil-rights claims under §§ 1981 and 1982. *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) ("The right to 'lease' is protected by § 1982 against the actions of third parties, as well as against the actions of the immediate lessor. . . . A narrow construction of the language of § 1982 would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by [the Act]." (citations omitted)); *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975) (extending *Sullivan*'s rationale to § 1981 claims for interference with contractual relations). The problem for Shaikh, however, is that what he alleges the City did in this case—inform him that it was contemplating the use of its eminent-domain power—never interfered with his ability to purchase the building.

The Supreme Court in *Sullivan* did not discuss what type of action it anticipated would constitute third-party interference. But the concept of third-party interference with contractual or business relationships is not novel; it is a well-recognized common-law tort. And that tort is essentially what Shaikh complains about here—that the City, a competitor, interfered with his business opportunity to purchase and develop the Lowe avenue apartments by "threatening" to take the property from him by eminent domain. To succeed on a tortious-interference claim under Illinois law the plaintiff must show *inter alia* "an intentional interference by the defendant which prevents the [plaintiff's] expectancy from ripening into a valid business relationship." *Heying v. Simonaitis*, 466 N.E.2d 1137, 1140-41 (Ill. App. Ct. 1984) (citation omitted).

Here, the City's actions never prevented Shaikh's legitimate interest in purchasing the property from ripening. HUD at all times remained a willing seller and Shaikh was free to proceed with the transaction. The City could not stop him. The gravamen of Shaikh's complaint is that he withdrew from the sale because he had envisioned the Lowe-apartment purchase as a long-term investment and no longer considered that prospect lucrative in light of the City's statements. But whether or not the City informed him of the possibility that it could seek to take the property by eminent domain, it was always a risk he bore. *See United States v. 16.92 Acres of Land*, 670 F.2d 1369, 1371 (7th Cir. 1982) ("Every person who acquires or occupies land does so at the risk of being evicted by the exercise of the superior right of the government or its delegate to acquire his interest upon payment of just compensation." (citation omitted)). Shaikh's choice to withdraw from his purchase agreement with HUD was a means to avoid a possibility that any purchaser of residential rental property that has been foreclosed upon may face—the local government may seek to have the property condemned.

But to hear Shaikh tell it, the City's presale "threats" sound ominous. After all, Shaikh alleges that the City, without any concrete authority or intent to follow through, strongarmed him out of his purchase agreement by suggesting that after he invested his time, money, and efforts into acquiring the property, the City would snatch it from him. Moreover, he argues that the only reason the City advanced these threats was to prevent him, an out-of-state U.S. citizen of Indian-Muslim descent, from acquiring the property in the first place. Shaikh argues we should analogize the City's statements to threats against potential purchasers to enforce the housing code vigorously, to deny future zoning permits, or to withhold municipal services such as police and fire protection, all in an effort to prevent the purchase. *See, e.g.*, *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (affirming appellate court's reversal of district court's dismissal of plaintiff's "class of one" equal protection claim, which alleged discriminatory animus in municipality's demand for a 33-foot easement to property in return for a connection to the municipal water supply in excess of standard requirement of 15-foot easement); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 558 F.2d 1283, 1294 (7th Cir. 1977) (finding statutory obligation under Fair Housing Act to refrain from zoning policies that effectively foreclose the construction of low-cost housing within municipality; remanding to determine whether that obligation was violated); 24 C.F.R. § 100.70(b) & (d)(4) (2003).[2]

---

[2] The regulations pertaining to discriminatory conduct under the Fair Housing Act explain that

(b) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to engage in any conduct relating to the provision of hous-

(continued...)

Shaikh's comparisons are not apt. The City didn't threaten to harm Shaikh's person if he bought the property. *See, e.g.*, *Vietnamese Fisherman's Ass'n v. Knights of the Ku Klux Klan*, 518 F. Supp. 993, 1008 (S.D. Tex. 1981) (permitting § 1981 claim where plaintiffs complained of defendants' threats and intimidation, which interfered with their ability to make contractual relationships with dock owners and thereby engage in commercial fishing business). It didn't threaten to withhold fire or police protection, which could endanger Shaikh or others residing in the building, result in the destruction of his property, or prevent him from obtaining necessary hazard insurance. *See, e.g.*, 24 C.F.R. 100.70(b) & (d)(4). And it didn't engage in any conduct under the veil of legal authority (such as rezoning or the refusal to rezone) having the effect of making the property unavailable for purchase. *See, e.g.*, *Metro. Hous. Dev. Corp.*, 558 F.2d at 1294. In the first two examples the threat of personal injury or catastrophic loss without recompense may legitimately and reasonably impair an individual's freedom to contract or purchase property. In the third, the municipal-

---

[2]  (...continued)

ing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons.

. . . .

(d) Prohibited activities relating to dwellings under paragraph (b) of this section include, but are not limited to:

. . . .

(4) Refusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance differently because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.70(b) & (d)(4) (2003).

ity's action directly prevents the sale. In contrast to these examples, all that the City did here is state its intention to exercise its statutory authority to pursue condemnation proceedings at some future point in time. That authority, if ever exercised, would have to be carried out within constitutionally and statutorily mandated limits. And considering those limits, we cannot construe the City's prospective statements as "interference" with Shaikh's ability to purchase the property.

The takings clause of the Fifth Amendment (made applicable to state and local governments vis a vis Fourteenth Amendment incorporation, *see Chicago, Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226 (1897)) imposes considerable limits on the exercise of the eminent-domain power. Primary among them are that the taking must be for public use and that the government must pay the owner just compensation, which is determined to be the property's fair market value. *See, e.g.*, *United States v. Miller*, 317 U.S. 369, 373-74 (1943); *United States v. 58.16 Acres of Land*, 478 F.2d 1055, 1058 (7th Cir. 1973). Although the mere "threat" to use the power of eminent domain doesn't constitute a taking and trigger these protections, *see, e.g.*, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321-23 (2002) (a taking requires government confiscation or physical occupation, or in the case of a regulatory taking, a regulation so severe that it leaves no reasonably economically viable use of the property), if the City ever followed through and initiated condemnation proceedings it would have to comply with these constitutional strictures. The public-use protections would resolve Shaikh's concerns that the City was not motivated to take his property for the stated intention of relocating the Kennedy-King campus but rather by unlawful, discriminatory animus. *See, e.g.*, *58.16 Acres of Land*, 478 F.2d at 1060 (observing that allegations of bad faith, arbitrariness, and capriciousness

in the exercise of the eminent-domain power all bear upon the public-use determination). And if the City's intentions were valid, Shaikh would be entitled to receive the fair market value for the property, regardless if the City in its negotiations with Shaikh suggested otherwise. *See Miller*, 317 U.S. at 374 (1943).

Moreover, the City, as an Illinois municipal corporation, holds no sovereign power of eminent domain. Instead, the state legislature must delegate that authority by specifically conferring the right by legislative enactment. And the City must exercise that delegated authority in strict compliance with the State's statutory grant. *Forest Preserve Dist. v. Chicago*, 513 N.E.2d 22, 23 (Ill. App. Ct. 1987); *see, e.g.*, 65 ILL. COMP. STAT. ANN. § 5/11-61-1 (2003) (delegating to all municipalities the exercise of eminent domain by condemnation proceedings, in conformity with the Illinois constitution and state statutes, to acquire property for municipal purposes).

Under Illinois law, a person who wishes to challenge the propriety of a condemnation proceeding must file a motion to dismiss during the preliminary stage of the condemnation proceedings. *Towne v. Town of Libertyville*, 546 N.E.2d 810, 813 (Ill. App. Ct. 1989). And the state-court condemnation process, with possibility of ultimate appeal to the U.S. Supreme Court, provides the appropriate venue to raise constitutional or statutory challenges to the exercise of the eminent-domain power by state or local governments. *See Green St. Ass'n v. Daley*, 373 F.2d 1, 6-7 (7th Cir. 1967); *S.W. Ill. Dev. Auth. v. Vollman*, 600 N.E.2d 926, 928-29 (Ill. App. Ct. 1992) (noting availability of interlocutory appeal to challenge exercise of eminent-domain power); *Towne*, 546 N.E.2d at 814 (noting trial court's ability to determine constitutional challenges to the exercise of the eminent-domain power). Thus, Shaikh would have a venue to raise his challenges to the City's actual exercise of their eminent-

domain power at the earliest opportunity, once the City undertook action in a state court to initiate condemnation proceedings.

If, on the other hand, the City had no concrete authority to pursue condemnation proceedings at the time it spoke and never intended to follow through, then Shaikh never had any reason to worry. *Cf. Garry v. Geils*, 82 F.3d 1362, 1368 (7th Cir. 1996) (observing that the takings injury alleged was only complete when state court actually condemned the property). In *Geils*, we held that we had no federal jurisdiction under the *Rooker-Feldman* doctrine to consider plaintiff's civil-rights claims, which alleged that local authorities had unconstitutionally exercised their eminent-domain power. 82 F.3d at 1368-70. The injury that the plaintiff suffered was not complete until the state court, in a condemnation proceeding, issued an order condemning the property. *Id*. at 1368. Thus, the plaintiff essentially claimed injury at the hands of the state court (for failure to root out the municipality's improper motives) and sought collateral review of that decision under the guise of a federal civil-rights action. *Id*. While the plaintiff could have raised his constitutional challenges in the state-court condemnation proceedings and appealed an adverse result to the highest court in the land, he could not seek to attack the result collaterally in a federal civil-rights action. *Id*. at 1369-70.

Although not directly controlling precedent (because the City never initiated condemnation proceedings), we find the deference we exercised in *Geils* to the state court's opportunity to resolve the types of challenges Shaikh asserts here, informative. It seems incongruous to hold, on the one hand, that because a state court has the opportunity and responsibility in condemnation proceedings to ensure the lawful exercise of a local government's eminent-domain power, a federal court must abstain from rendering civil-rights relief that would essentially invalidate

the result of those proceedings, and yet allow, on the other hand, a property owner to avoid those state-court condemnation proceedings altogether by seeking preemptive federal civil-rights relief at the first suggestion of a municipality's intent to take the property.

As a matter of fact, instead of complaining about the government talking too much or too early about seizing property by eminent domain, a more typical complaint from property owners is that the government talked too little or too late, and violated due process by *not* timely or adequately informing them of its intention to exercise its eminent-domain power. *See, e.g.*, *United States v. 125.2 Acres of Land,* 732 F.2d 239 (1st Cir. 1984) (when the government knew the landowner's name and hometown and could have looked up his street address in the telephone book it could easily have notified the owner of condemnation proceeding by mail or other direct means, such as leaving a notice at his residence; its failure to do so and decision instead to content itself with publishing and posting rendered the notice defective). We hesitate to impose a Catch-22 rule whereby those governments contemplating the use of their eminent-domain powers are subjected to liability regardless of whether they choose to remain silent or to speak.

Shaikh's §§ 1981 and 1982 claims are therefore barred because the City's statements never interfered with his ability to purchase the property, *accord Morris*, 89 F.3d at 414-15 (upholding grant of summary judgment to defendants on §§ 1981 and 1982 claims where plaintiff failed to show actual loss of contract interest or denial of right to purchase property; possible loss of future contract possibilities was insufficient). It may be, however, that Shaikh's assorted § 1983 claims alleging discrimination on account of his race, nationality, citizenship, or personality survive the §§ 1981 and 1982 analysis. To succeed under § 1983, Shaikh need only show that the

City acted under color of law intentionally to deprive him of "rights, privileges, or immunities secured by the Constitution or laws of the United States." *New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474, 1479 (7th Cir. 1990) (quotations omitted). And the equal-protection and due-process clauses of the Fourteenth Amendment carry neither the contractual nor sale-of-property elements found in §§ 1981 and 1982 respectively.

Thus, it is at least conceivable that the City's statements—although of no ultimate effect upon Shaikh's ability to proceed with the transaction—could nevertheless constitute invidious racial, religious, ethnic, or other discrimination actionable under § 1983. For example, we could envision some municipal government that, motivated by unlawful discriminatory animus to prohibit the introduction of a particular minority group into a community, employs a policy of contacting each prospective minority purchaser and informing them that if they buy the property, it will seek to take it from them by eminent domain a short time later. Confronted with evidence of such blatantly discriminatory harassment, we might be less sanguine about the prospective nature of the municipality's statements and their resulting immateriality. But we need not consider that issue here since Shaikh's own pleadings and materials reveal that the City treated both him and the second set of buyers (Caucasian, non-Muslim, out-of-state citizens) the same. The only difference between the two is that the second set of purchasers were unsuccessful in withdrawing from their purchase agreement with HUD. Nor has Shaikh provided any facts suggesting that the City treated any other similarly situated, non-minority individual differently than he. Therefore, even if we must construe the City's prospective statements as an action triggering the protections of the Fourteenth Amendment, Shaikh's § 1983 claims cannot survive summary judgment because he

has not shown that he was the victim of any differential treatment, let alone that the City intended to treat him unfavorably.

In sum, because the City was not the property owner, it lacked any authority directly to affect the sale between HUD and Shaikh and thus did not prevent Shaikh from buying the property. Furthermore, Shaikh, like all citizens, acquires or occupies his property subject to the superior right of eminent domain exercised in accordance with constitutionally and statutorily mandated restrictions upon that power. Reasonably construed against those restrictions (and the opportunity that state-court condemnation proceedings provide to enforce them), the City's statements here were not intimidating threats that restrained or interfered with Shaikh's ability to purchase the property. Shaikh therefore has no civil-rights remedy under §§ 1981 or 1982. And even if Shaikh could still assert equal-protection or due-process claims under § 1983 on the basis of the City's statements alone, he cannot survive summary judgment on those claims because he has not shown that he was a victim of invidious discrimination. We therefore AFFIRM the district court's grant of summary judgment.

A true Copy:

      Teste:

                               _____

                               *Clerk of the United States Court of Appeals for the Seventh Circuit*