GINX, INC., d/b/a Lola, Gayle Patrick–Odeen, individually, Tom Odeen, individually, Plaintiffs,

v.

SOHO ALLIANCE, Daniel B. Boyle, individually, Lawrence Gedda, individually, Noreen Healey, individually, John S. Sweeney, individually, John Evans, individually, and Marie Evans, individually, Defendants.

No. 09 Civ. 6977(CM).

United States District Court, S.D. New York.

June 24, 2010.

As Corrected Aug. 19, 2010.

Ambrose Wotor Wotorson, Jr., Law Offices of Ambrose Wotorson, P.C., Brooklyn, NY, for Plaintiffs.

Joel Graber, New York State Office of the Attorney General, Raymond W. Belair, Marshall James Shepardson, Belair & Evans, LLP, New York, NY, for Defendants.

DECISION AND ORDER GRANTING THE MOTIONS OF DEFENDANTS NOREEN HEALEY, JOHN EVANS AND MARIE EVANS TO DISMISS THE AMENDED COMPLAINT; DISMISSING THE AMENDED COMPLAINT AS AGAINST THE UNSERVED DEFENDANTS; AND DENYING AS FUTILE PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

McMAHON, District Judge:

Before the Court are motions to dismiss this action by Defendant Noreen Healey (Commissioner of the New York State Liquor Authority, sued in her individual capacity), and Defendants John and Marie Evans. The Plaintiffs—who have already served one amended complaint—respond to the motions with a further proposed amendment of their pleading.

Both motions to dismiss are meritorious and are granted. Because it would be futile to permit Plaintiffs to amend their complaint, their motion for leave to amend is denied with prejudice.

The Evanses' additional motion for the imposition of sanctions under New York State's Anti–SLAPP statute is denied.

The same claims that have been asserted against Commissioner Healey are also asserted against two former State Liquor Authority (the "SLA" or the "Authority")

Commissioners—Daniel Boyle and Lawrence Gedda. Neither defendant has been properly served, although the SLA, per the Court's direction, gave their last known personal addresses to Plaintiffs' counsel some time ago. As 120 days and more have passed since the issuance of the amended summonses—and more than 300 days since the issuance of the original summonses, which were never served on anyone—the Court sua sponte dismisses the complaint as against them. Since the dismissed claims would be no more meritorious against Commissioners Boyle and Gedda than they were against Commissioner Healey, dismissal is with prejudice.

### *FACTS*

#### Pre–Appellate Division Proceedings

The following facts concerning the establishment known as Lola's are a matter of public record, as recorded in various administrative and court filings and decisions. To the extent that the complaint refers to or relies on a particular document, it is of course proper for the Court to consider the entire text of that document in deciding any motion to dismiss. Additionally, the Court is free to consider the contents of documents that the Plaintiffs either possessed or knew about that are integral to their claims. *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir.2000) (*citing Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d

Cir.1996). As will be seen, any reference to several important court and administrative documents has been inexplicably and improperly omitted from the Amended Complaint, thereby creating a demonstrably false impression of certain key facts,[1]

Plaintiff Gayle Patrick–Odeen is an African–American woman. (Pls.' Am. Compl., Oct. 26, 2009, ¶ 4.) Plaintiff Tom Odeen, her husband, is a Caucasian male. (*Id.* at ¶ 5.) Ginx, Inc. is a company that the couple owns and controls. (*Id.* at ¶¶ 4–5.)

For nineteen years, Plaintiffs (through Ginx) operated a successful restaurant/club, known as Lola's, in the Chelsea area of Manhattan. (*Id.* at ¶ 9(a).) According to the Amended Complaint, Lola's developed a "stellar reputation" as a restaurant that featured live music. (*Id.* at ¶ 9(b).)

After losing their lease, Plaintiffs decided to move Lola's to a new location in Soho—specifically at 5–15 Watts Street (*id.* at ¶ 9(c)), the site of the former "Club Chaos," which was the subject of considerable neighborhood ire until it closed (Affirmation of Scott Weiner, SLA Staff Attorney, Ex. B at 5 ¶ 7 (ALJ Mem., dated Dec. 30, 2004)). The new location was within 500 feet of at least three other establishments with on-premises liquor licenses. (Weiner Aff. Ex. B at 4 ¶ 2.) In fact, the record reveals that this address was within 500 feet of as many as 35 other licensed establishments. (*Id.*)

Because of the proximity of so many other licensed premises, Lola's could not

---

1. The relevant documents—both those to which the Amended Complaint adverts and those it inexplicably omits to mention—were provided to the Court by counsel for the State Liquor Authority in connection with its motion to dismiss the Amended Complaint. (Affirmation of Scott A. Wiener, SLA staff attorney, dated Feb. 1, 2010, Exs. A–K; Affirmation of Donald T. Martin, SLA Senior Attorney, dated Mar. 8, 2010, Exs. A–B.) Subsequently, the Plaintiffs also provided some of these documents, but only after the Court asked where they were. (Amended Supplemental Affirmation of Ambrose Wotorson, dated June 14, 20, Exs. 1–16.)

obtain an on-premises liquor license without the approval of the State Liquor Authority. N.Y. Alco. Bev. Cont. Law ("ABCL") § 64(7)(f) (2009). The statute creates a presumption against the issuance of the liquor license, and requires the SLA to consult with the community before making a determination that the on-premises license would be in the public interest. *Id.*

Lola's filed an application for an on-premises license. (Am. Compl. ¶ 9(e).) Section H of the application, entitled "Proposed Method of Operation," indicated that the premises would operate as a restaurant/lounge, featuring only "Background Music." (Weiner Aff. Ex. C, Sec. H (SLA Mem., dated Feb. 4, 2005).) In press accounts that Plaintiffs have attached to (and therefore incorporated into) their complaint, Plaintiffs admitted that their attorney filed an application that did not ask for permission to play live music at Lola's new location—which they characterize as lawyer error. (Am. Compl. Ex. 1 (Chloe A. Hilliard, *Deep South of Houston: Is a Soul–Food Restaurant Too Black for Soho?*, Village Voice, May 6, 2008), at 2; Ex. 2 (Kelly E. Carter, *Whatever Lola Wants*, Black Enterprise, December 2008), at 86.)

An administrative law judge (the "ALJ") affiliated with the SLA conducted a hearing (known as a 500–Foot Rule Hearing) on November 30, 2004. (Weiner Aff. Ex. B at 1.) At the hearing, substantial opposition to Lola's application was voiced, including opposition from an organization called the Soho Alliance. (*Id.* at 3–4.) Other opponents included Community Board #2 and the Soho Arts Council, neither of which is named as a defendant in these proceedings. (*Id.*)

At the hearing, Lola's made oral concessions on at least some of the issues raised by the community. Plaintiffs agreed that Lola's would close at 1:00 a.m. rather than 4:00 a.m., and also agreed to soundproof the premises. (*Id.* at 1.) Plaintiffs also presented 535 signatures from members of the Soho community who supported the application, as well as 45 letters of support. (Am. Compl. ¶ 9(k).)

After a full hearing, the ALJ Report of December 30, 2004 summarized the evidence in the record, but (contrary to Plaintiffs' representation in the Amended Complaint) made no discernable recommendation one way or the other on the application. (Weiner Aff. Ex. B; Am. Compl. ¶ 9(j).) The SLA's Licensing Board Memorandum of February 4, 2005 cited the ALJ Report but the "Licensing Board Recommendation" is listed as "deferred." (Weiner Aff. Ex. C at 2.) I assume this means that the Deputy Commissioner, who wrote the SLA Memo, deferred to whatever decision the Commissioners might reach. To the extent that Plaintiffs' Amended Complaint asserts that "the ALJ concluded that Lola's application *would be* in the public interest," the Court cannot consider this a "well-pleaded allegation" or accept it as true, since it contradicts the text of the ALJ's Report. (Am. Compl. ¶ 9(j) (emphasis in original)); *see Ashcroft v. Iqbal* —— U.S. ——, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009).

Despite the absence of any recommendation from the ALJ or Deputy Commissioner, the SLA determined that Plaintiffs' application was in the public interest "for the reasons stated in" the ALJ's report, and granted the license on March 2, 2005. (Weiner Aff. Ex. D at 1 (SLA Determ., dated Mar. 2, 2005).) As I have observed, the ALJ's report did no more than summarize the arguments of those in favor of the application and those opposed. The SLA failed to indicate which of those arguments it found persuasive or why those arguments trumped the legal presumption that

there should be no more than three licensed premises in close proximity to one another. (*Id.*)

It is clear enough, from the ALJ's Memorandum (Weiner Aff. Ex. B at 1 ¶ 1), as well as from the minutes of the SLA Meeting on March 2, 2005 (Weiner Aff. Ex. D at 4 ¶ 1), that the SLA Commissioners were aware that the applicants had stated at the administrative hearing that Lola's would feature live music. The ALJ's Memorandum specifically notes counsel's statement that Lola's would be a "restaurant/lounge featuring live music." (Weiner Aff. Ex. B at 1.) The SLA's "listing"—which purportedly is where the commissioners explained their reasons for granting the application—includes this statement from the ALJ's report. (Weiner Aff. Ex. D at 4 ¶ 1.)

However, the license that issued to Plaintiffs does not permit live music; it provides only for "background music." That is because the application that was filed by Plaintiffs, and approved by the SLA, requested a "background music" permit rather than a "live music" permit. The error is obvious, yet Plaintiffs did not seek to formally amend their "background music" application until December 2007— well after the "background music only" license issued. (Affirmation of Donald Martin, SLA Senior Attorney, Ex. A at 3 (Recom. of Bureau of Licensing, dated July 14, 2008).) So when the SLA issued its March 2, 2005 decision, which says that it approved *the application* "in light of all the pertinent facts and circumstances" (Weiner Aff. Ex. D at 6), the application it was approving was *not* an application for a premises with live music. *This is the critical fact in the case;* and while it can be discerned from various documents that are alluded to or attached to the complaint, it is nowhere mentioned in the pleading itself.

Some 22 community groups and over 100 individuals resident in the neighborhood—including named Defendants Soho Alliance, John Sweeney, John Evans and Marie Evans—filed a proceeding under Article 78 of the Civil Practice Law and Rules ("CPLR") in New York State Supreme Court to challenge the SLA's decision.[2] (*See* Weiner Aff. Ex. G at 1 (Affirmation of Thomas Donohue, SLA Chief Counsel, dated Sept., 28, 2006).) The SLA defended its public interest determination in court.

On November 17, 2005, The Hon. Marilyn Shafer, J.S.C., vacated and annulled the SLA's decision to grant the on-premises liquor license. *Soho Alliance v. N.Y. State Liquor Auth.,* No. 103970/05, slip op. at 9–10 (N.Y.Sup.Ct. Dec. 2, 2005). Because the existence of "at least 35 other licensed establishments within 500 feet of the proposed premises" created a presumption against issuing a permit, Justice Shafer concluded that ABCL § 64 obligated the SLA to set forth precisely what "facts and circumstances" rendered the application "in the public interest." Its failure to do so rendered its decision to override that presumption arbitrary and capricious. *Id.* at 7, 9. The court took note of the extensive evidence presented in opposition to the application, including unanimous opposition by public officials (Community Board # 2 and a state senator, assemblyperson and councilmember); the testimony of a traffic expert; and photos of traffic jams along Watts Street. *Id.* at 9. She observed that the SLA did not

---

**2.** The amended complaint avers that some of the persons who were listed as petitioners on the March 2005 Article 78 petition had not authorized Soho Alliance or anyone else to list them as petitioners. (Am. Compl. ¶ 9(w), 9(x).) The Court accepts this as true for purposes of this motion; it is, however, irrelevant.

discuss how it reconciled the conflicting evidence on which it relied. *Id.*

As a remedy, Justice Shafer directed the SLA to cancel Lola's license forthwith. *Id.* According to Plaintiffs, the restaurant was unable to operate as a result. (Am. Compl. ¶ 9(t).)

### Appellate Division Proceedings

Plaintiffs appealed. On August 31, 2006, the Appellate Division, First Department, reversed the order directing the SLA to cancel Lola's liquor license and remanded the case to the SLA for a limited purpose. *Soho Alliance v. N.Y. State Liquor Auth.,* 32 A.D.3d 363, 364, 821 N.Y.S.2d 31 (1st Dep't 2006).

Interestingly, the First Department *agreed with Justice Shafer* that the SLA's March 2005 decision did not set forth why the Authority concluded that the license was in the public interest. *Id.* at 363, 821 N.Y.S.2d 31. Nonetheless, the court held that this defect did not warrant directing the Authority to cancel the license. The appellate court noted that the Authority had recited the evidence in the record on both sides of the issue and had made its public interest determination after considering "all the facts and circumstances" as well as "the criteria set forth in Section 64, subdivision 6–a of the Alcoholic Beverage Control Law." *Id.* at 364, 821 N.Y.S.2d 31. The appellate court went on to say, "It may be surmised that the Authority adopted as its own the reasons of those in favor of the license. But the Authority does not expressly state so.... What is missing from the Authority's decision is a specific expression of its reason or reasons for its finding that granting the liquor license is in the public interest." *Id.*

The Appellate Division remanded the matter to the SLA so it could fill in that one remaining blank:

> We vacate the [Supreme Court's] direction to the Authority to cancel the liquor license, and remit to the Authority, pursuant to CPLR 7806, directing [the SLA] *only* to properly state its reasons for granting the liquor license.

*Id.* (emphasis added). The Appellate Division made it quite clear that, on remand, "there need be no further 'consultation' with the Community Board," because the Board had been on notice of the original hearing and the law did not require that it be consulted a second time. *Id.*

In short, the Appellate Division agreed with the Supreme Court's analysis, but disagreed with the remedy the judge ordered.

After this decision was handed down, the SLA made a motion in the Appellate Division to modify that court's order so as to permit the Commissioners to undertake *de novo* review of Lola's application.[3] (Weiner Aff. Ex. G ¶ 9.) The ground for the motion was that the commission's membership had changed—two of the three members were new—and the members who had not been involved with the original decision were finding it difficult to carry out the Appellate Division's order. (*Id.* ¶¶ 6–7.) Counsel for the Commissioners also indicated that the newly-constituted Commission might reach a different

---

**3.** The Amended Complaint alleges that the Soho Alliance made the above-described motion. (Am. Compl. ¶ 9(cc).) However, the affirmation supporting the motion, which has been provided to the Court, shows only that "the Authority" requested the relief sought. (Donohue Aff. ¶ 9.) The Amended Complaint does allege that the SLA was acting in "open conspiracy" with the Soho Alliance, which had participated as a respondent on the appeal. (Am. Compl. ¶ 9(cc).) In support of this assertion, the pleading alleges only that the Soho Alliance claimed to be "acting on behalf" of the commissioners and that the commissioners did not object. (*Id.*)

conclusion than the old Commission had reached. (*Id.* ¶ 8.) The motion was denied.

### Post–Appellate Division Proceedings

Although it has taken the Court considerable effort to figure this out, the crux of this lawsuit concerns the events that took place *after* the Appellate Division issued its orders.

On April 12, 2007, the SLA (by the named Defendants Commissioners Boyle, Gedda and Healey) issued a statement of reasons why the prior Commissioners had made the decision they made. (Weiner Aff. Ex. I.) This document, entitled "Reasons for Approval," is not specifically referenced in the Amended Complaint; again, *neither is the critical fact that the document concludes by recording that the Commissioners voted in favor of re-issuing the license to Lola's.* Indeed, from reading the Amended Complaint, one might well conclude that the SLA had reconsidered Lola's application and denied it.

Because the so-called "new decision" is referred to and relied upon in the pleading (Am. Compl. ¶ 9(dd)), the Court can and does consider it, under the rule that the full text of documents referred to or relied upon in a pleading are properly before the court on a motion to dismiss. *Rothman,* 220 F.3d at 88–89; *San Leandro,* 75 F.3d at 808.

Contrary to the conclusory allegation of the Amended Complaint, the Reasons for Approval flatly states that the Members of the Authority "have not conducted a de novo review of the application, and in particular, the issue of public interest. Nor have the Members substituted their judgment for that of the Full Board which rendered the initial determination." (Weiner Aff. Ex. I at 5.) The Commissioners reviewed the record as it existed before the old Commission and concluded as follows:

The Full Board was not aware of any history of violations of the Alcoholic Beverage Control Law or criminal history at the proposed licensed location;

The applicant had obtained all necessary municipal licenses and permits to operate the proposed licensed business;

While the licensed business would have an effect on traffic and parking in the area around the proposed establishment, such an impact would be minimal given the current traffic and parking issues in the area;

The applicant has taken reasonable steps to address any problems with noise emanating from the establishment; and

*While there are a significant number of licensed establishments in the area, this establishment, unlike the nightclubs which were the subject of complaints by those in opposition, will be a bona fide restaurant with no live music or dancing.*

Therefore, based upon the above, it appears that the Authority found that it would not be contrary to public interest to approve the application.

(*Id.* at 5–6 (emphasis added).)

In their Amended Complaint, the Plaintiffs assert that the Commissioner Defendants (Boyle, Gedda and Healey) indicated that they wished to "revisit" Lola's application. (Am. Compl. ¶ 9(dd).) And so they did, as their motion before the Appellate Division attests. However, they lost that fight; and from the text of the April 2007 decision itself, it is clear that the Commissioners did *not* revisit the application, but rather did their best to discern why that decision was reached. (Weiner Aff. Ex. I at 5.) Plaintiffs' conclusory assertion to the contrary is a complete fabrication by counsel, which the Court is not

required to credit in view of the actual text of the document; it, too, will be ignored.

No sooner did the Reasons for Approval issue than a substantially smaller number of petitioners—including Defendant Soho Alliance and Defendants John and Marie Evans and John S. Sweeney, but not the Community Board[4] or the Soho Arts Council—brought a second Article 78 proceeding to attack the reissuance of the license. *Soho Alliance v. N.Y. State Liquor Auth.*, No. 106400/07, slip op. (N.Y. Sup.Ct., Apr. 21, 2008). This second proceeding is not mentioned in either the Amended Complaint or in the Evanses' motion to dismiss, although Plaintiffs and the Evanses were obviously aware of it.

By decision and order dated April 21, 2008, Justice Shafer *again* annulled the SLA's original March 2, 2005 determination, as confirmed by the Reasons for Approval. *Id.* at 6. Acknowledging that the only issue before her was whether the SLA had properly complied with the First Department's order, she found that it had not done so. She ruled that the Reasons for Approval were unacceptably "pro forma" and lacking an adequate explanation of why "Lola's impact on traffic and noise will be minimal." *Id.* at 5. She once again vacated the granting of a liquor license and remanded the matter to the SLA with the direction that it conduct a *de novo* review of Lola's application—precisely what the Appellate Division told it not to do. *Id.* at 7.

No such review ever took place. Instead, Plaintiffs filed a Notice of Appeal from this decision with the Appellate Division, First Department. (Weiner Aff. Ex. K (Notice of Appeal, dated June 2, 2008).) The Court is not aware of the results of this appeal. However, Plaintiffs attached to (and so incorporated into) their pleading

some press accounts of the Lola's saga, one of which indicates that the restaurant declared bankruptcy at some point—which would, of course, have stayed any pending appeal until the denouement of this story rendered it moot. (Am. Compl. Ex. 2 at 86.)

The same press account indicates that Lola's opened for business in the autumn of 2007, albeit with a liquor license that allowed only background music (*id.*), and asserts that the SLA awarded Lola's a liquor license with live music on July 17, 2008. (*Id.*)

Counsel for the Authority has filled in the blanks. A copy of a memorandum from the Licensing Bureau concerning Plaintiffs' Request for Reconsideration reveals that Lola's finally filed an endorsement application to change its method of operation to "liquor license with live music" on December 3, 2007—after the Reasons for Approval had issued and while the second Article 78 proceeding was pending before Justice Shafer. (Martin Aff. Ex. A at 2.) The SLA denied this application on March 20, 2008, ruling that there was no merit in the licensee's argument that "live music" had been part of the original application. (*Id.*) Plaintiffs sought reconsideration, and the Licensing Bureau staff—noting that Lola's should have amended its application long before it did—deferred to the Chairman of the Authority. The Chairman granted the request for reconsideration on July 15, 2008. (*Id.* at 3.) At a meeting two days later, Defendants Boyle and Healey voted in support of Plaintiffs' request for a liquor license with live music. (Martin Aff. ¶¶ 8–10, Exs. A, B.)

By then, of course, it was too late. According to the Amended Complaint, in the summer of 2009—after operating with a

---

4. Defendant John Sweeney is allegedly both the head of the Soho Alliance and a member of Community Board # 2. (Am. Compl. ¶ 9(hh), 9(ii).)

live music license for a year—Lola's closed. (Am. Compl. ¶ 11.) Plaintiffs allege that the facility closed under the weight of the financial pressures associated with years of litigation and the delayed opening. (*Id.*) They contend that, "but for the activities of the Soho Alliance," Lola's would have remained open; the cost, economic and otherwise, of the four-year fight for its liquor license eventually ran it out of business. (*Id.* ¶ 12.) The complaint specifically alleges that the Alliance's activities were racially motivated; it avers that the Soho Alliance has not opposed liquor license applications for premises in the neighborhood that were operated by persons who were not African–Americans. (*Id.* ¶ 10.)

This action followed. The complaint, which was filed on August 6, 2009, and amended on October 26, 2009, names as defendants the Soho Alliance and its alleged head, John S. Sweeney; local residents John and Marie Evans; and SLA Commissioners Daniel B. Boyle, Lawrence Gedda and Noreen Healey. (*Id.* at 1.)

The Amended Complaint contains three causes of action. The first charges the Soho Alliance, Sweeney and the Evanses with violating 42 U.S.C. § 1981. It alleges that their activities in opposition to the opening of Lola's interfered with Plaintiffs' ability to enter into contracts with patrons and charges that this interference was motivated by racial animus. (Am. Compl. ¶ 20.)

The second claim alleges that the three Defendant Liquor Authority Commissioners violated the Fourteenth Amendment when they "essentially undertook a de novo review" of Lola's application in their April 2007 decision. (*Id.* ¶ 22.) Papers filed in opposition to the motions to dismiss reveal that the factual underpinning for this allegation consists entirely of the fact that the Commissioners inserted the statement about Lola's operating with background music only into the Reasons for Approval.

A third cause of action against Soho Alliance, for fraud, is not implicated in any motion presently before the Court. (*Id.* ¶ 29.)

SLA Defendant Noreen Healey and the Evanses have moved to dismiss the complaint. In addition, counsel for the SLA, while only appearing on behalf of Healey, suggests that the complaint be dismissed as against the other two SLA Defendants, because they have not been properly served with process and the time for effecting service has long since expired.

Plaintiffs have effectively cross-moved for leave to file a second amended complaint, which is attached to their opposition to both motions.

The moving Defendants' motions to dismiss are granted; the Plaintiffs' application for leave to file a second amended complaint is denied.

## DISCUSSION

### I. The Standard on a Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir.2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir.2007).

However, to survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, — U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct.

1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (*citing Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570, 127 S.Ct. 1955; *Iqbal,* 129 S.Ct. at 1950–51.

In deciding a motion to dismiss, this Court may consider the full text not only of documents that are quoted in or attached to the complaint, but also of documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. *Rothman,* 220 F.3d at 88–89; *San Leandro,* 75 F.3d at 808. When plaintiffs fail to include any reference to documents that they knew of that are integral to their claim, there is no need for the court to convert the motion to a summary judgment motion in order to take them into account. "Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on the motion." *Cortec,* 949 F.2d at 44; *see I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) (refusing "to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because

plaintiff has chosen not to attach the [document] to the complaint or to incorporate it by reference").

In this case, the rule just discussed means the Court can consider the text of the April 17, 2007 Reasons for Approval; the second Article 78 petition; and Justice Shafer's decision on that petition—all critically important documents that Plaintiffs' counsel has elected not to refer to in the complaint (I assume because they give the lie to several key allegations of "fact" in the amended pleading).

## II. Commissioner Healey's Motion to Dismiss Is Granted

The Amended Complaint alleges that Healey and her co-Commissioners violated Plaintiffs' right to due process and equal protection by conducting a de novo review of Lola's application for an on-premises permit after being specifically directed not to do so by the Appellate Division. (Am. Compl. ¶ 22.) Healey moves to dismiss on the merits and on the ground of qualified immunity. There is no need to reach the issue of qualified immunity, because both the due process and the equal protection claims fail on their merits.

### A. Due Process

Both of Plaintiffs' Fourteenth Amendment claims fail because the pleading alleges no plausible factual basis for relief. The Amended Complaint alleges that Commissioner Healey (and her co-Commissioners) entered into some sort of conspiracy with the Soho Alliance and, in furtherance of that conspiracy, undertook a de novo review of Plaintiffs' application for a liquor license for Lola's when they received the matter on remand from the Appellate Division—even though the Appellate Division had directed that they confine themselves to setting forth reasons

why the SLA originally voted to grant Lola's application for a premises permit. (Am. Compl. ¶ 9(cc)); *Soho Alliance v. N.Y. State Liquor Auth.*, 32 A.D.3d at 364, 821 N.Y.S.2d 31. Plaintiffs further contend (albeit not in the Amended Complaint, but in their brief) that this de novo review was undertaken secretly, without taking any new evidence or giving the Plaintiffs notice and an opportunity to be heard. (Pls.' Mem. in Opp. to Def. Healey's Mot. Dis., dated Mar. 1, 2010, at 19.)

 The factual underpinning for Plaintiffs' conclusory allegation that the Defendant Commissioners conducted a forbidden de novo review is the inclusion in their Reasons for Approval of the notation that Lola's was not planning to have live music. (Weiner Aff. Ex. I (Reasons for Approval, cited at Am. Compl. ¶ 9(gg)).) Plaintiffs allege that it was always their intention to have live music, which the original Commission panel knew. (Weiner Aff. Ex. D at 4 ¶ 1.)

It was unquestionably Plaintiffs' intention to have live music—Lola's was always a venue for live music—and the record reveals that this fact was discussed before the ALJ, and that discussion was incorporated into the SLA's listing. The problem is that Plaintiffs did not apply for a live music license—a fact that Plaintiffs (or at least their attorney) contrived to keep secret from the Court.

It is an incontrovertible *fact* that Plaintiffs did not apply for an on-premises license with a live music permit. The application submitted to the SLA was for a license for a premises that would feature background music only. (Weiner Aff. Ex. C, Sec. H.) For reasons that are incomprehensible to the Court (and were equally incomprehensible to the SLA staff), Plaintiffs never bothered to amend their defective application.

It is the application—not statements made by attorneys at hearings that were inconsistent with the application—that was the official and controlling document. It was this "application" that the SLA Commissioners "approved" on March 2, 2005—not the statements by the lawyers that are inconsistent with the application. Furthermore, the license that issued pursuant to the SLA's approval of the application was not a license that permitted the playing of live music—whatever plaintiffs originally intended. We know this because public records reveal that (1) Plaintiffs received some sort of license, which allowed them to open with only recorded background music, and (2) Plaintiffs thereafter amended their license application (though not until December 2007) and received a live music permit.

Because the application that was approved by the SLA in March 2005 specifically stated that the restaurant would not feature live music, and because that application was not amended prior to the issuance of the Reasons for Approval in April 2007, it is utterly and completely implausible to infer that the Commissioners conducted some sort of de novo review of Lola's application (while protesting that they were doing no such thing) upon remand from the Appellate Division. Therefore, the due process claim fails the test of *Twombly* and *Iqbal*.

The Proposed Second Amended Complaint does not remedy this problem—indeed, no allegation of fact could be added to remedy this problem. Plaintiffs' theory is doomed by the fact that the license they eventually got is the license for which they applied. Therefore, the second cause of action must be dismissed with prejudice insofar as it alleges a procedural due process violation.

## B. Equal Protection

The Equal Protection aspect of the Second Cause of Action is equally meritless.

To survive a motion to dismiss, Plaintiffs' claim must plead facts showing that the SLA commissioners intentionally discriminated against them, "either by adopting out of racial animus policies which are facially neutral but have a racially discriminatory effect, or by applying a facially neutral policy in a racially discriminatory manner." *Rivera–Powell v. N.Y. City Bd. of Elections*, 470 F.3d 458, 470 (2d Cir. 2006). In *Rivera–Powell*, a would-be candidate for a municipal judgeship sued the Board of Elections for removing her from the ballot. Judge Sotomayor, then on the Second Circuit, affirmed a dismissal of the suit's equal protection claim because it consisted of only "a conclusory allegation of discrimination, which, without evidentiary support or allegations of particularized incidents, does not state a valid claim and so cannot withstand a motion to dismiss." *Id.* (internal quotations omitted).

 The Second Cause of Action in the Amended Complaint appears to be an equal protection claim of the second variety: i.e., an allegation of racially discriminatory application of a facially neutral policy. It alleges that the SLA commissioners "treated plaintiffs different [sic] from how they treated other similarly-situated license applicants." (Am. Compl. ¶ 22.)

But the incontrovertible facts show that the SLA Commissioners voted in favor of issuing whatever license Plaintiffs had actually applied for, and did so every time the matter came before them. Plaintiffs allege that the Soho Alliance, the Evanses, et al. routinely challenge the licenses of bars catering to a minority clientele but not those catering to a white clientele (Am. Compl. ¶¶ 9(y), (x(2)), (z), (aa), (bb), 10). But these claims are leveled only at the private actor Defendants—not against Healey, the state actor who is the Defendant in the Second Cause of Action. There is no fact-based allegation in the complaint that, if proved, would show that Healey treated liquor license applicants one way or another based on race. Indeed, there is no mention beyond that single conclusory statement about the treatment by Healey or any other SLA commissioner of any license application other than those submitted by Plaintiffs.

This case is virtually identical to one (brought by the same attorney) that my colleague, The Hon. Paul A. Crotty, dismissed last year. In *Prasad v. New York*, the same attorney who here represents the Plaintiffs brought a case on behalf of a nightclub owner against government employees and the club's neighbors. 2009 WL 1119412, slip op. at 1, (S.D.N.Y.2009), *aff'd*, 370 Fed.Appx. 163 (2nd Cir.2010). The plaintiff in that case alleged that police and local residents had singled out his establishment, filing complaints that led to the revocation of his liquor license. He claimed, inter alia, that the defendants engaged in a "broad-based conspiracy" and violated his equal protection rights.

The District Court dismissed the equal protection claim. Plaintiff alleged that "other nightclubs with 'far worse problems' were not subjected to the same types of complaints and sanctions," but failed to allege that the owners or patrons of those other clubs were of a different race than those of the plaintiff's club. *Id.* at 4. Due to that failure and others, Judge Crotty found the equal protection claim to be "no more than a conclusory allegation of discrimination." *Id.*

Here, the equal protection claim is on even more tenuous ground. Even assuming for the moment that the Plaintiffs' conclusory allegation of "conspiracy" could pass muster under *Twombly–Iqbal* (it

can't), Plaintiffs have plead no fact from which one could conclude that the SLA treated Plaintiffs "different" [sic] from applicants of other races—in a negative way, that is—because the SLA repeatedly granted Plaintiffs' application for liquor licenses. Therefore, the Second Cause of Action is dismissed insofar as it depends on equal protection grounds.

Because the SLA consistently supported Plaintiffs' application for a license, there is no way to plead any fact that would resuscitate Plaintiffs' equal protection claim. Therefore, dismissal is with prejudice and leave to amend is denied as futile.

### III. The Complaint Is Dismissed as Against Defendants Boyle and Gedda

The amended summonses in this case issued on October 26, 2009. Pursuant to Federal Rule of Civil Procedure 4(m), a plaintiff has 120 days to serve a defendant. Plaintiffs' counsel purported to serve Defendants Gedda and Boyle—neither of whom is still an SLA Commissioner, and both of whom are sued only in their individual (not official) capacities—by delivering copies of the summons and complaint to the offices of the SLA. This obviously did not suffice as service on either Boyle or Gedda.

According to an affidavit submitted by counsel for the SLA and Defendant Healey, at the Court's direction the SLA provided counsel for Plaintiffs with the last known personal addresses of both Boyle and Gedda. (Weiner Aff. ¶ 41.) The Court's docket does not indicate that service has been effected on either of those Defendants personally. Plaintiffs' counsel has not asked for an extension of time to serve or suggested any reason why it would be appropriate to grant additional time.

Because the statute of limitations has not run, dismissal of the claim against the unserved Defendants would ordinarily be without prejudice. However, because the claim asserted against these defendants is not viable and cannot be rendered viable by amendment (for the reasons discussed above in connection with the disposition of Commissioner Healey's motion to dismiss), this particular dismissal is with prejudice.

### IV. The Evanses' Motion to Dismiss Is Granted; Leave to Amend the Complaint Further as Against Them Is Denied as Futile

John and Marie Evans reside at 362 West Broadway and are members of the Soho Alliance. (Am. Compl. ¶ 7.) They are alleged to be leaders but not officers or directors of the Soho Alliance—indeed, the complaint specifically alleges that another Defendant, John ("Sean") Sweeney, "for all practical purposes *runs* Soho Alliance, Inc." (*Id.* ¶ 7, 9(hh) (emphasis in original).)

The Amended Complaint alleges that the Evanses took two actions to express their opposition to Lola's presence in the neighborhood.

First, prior to the November 30, 2004 administrative hearing on Lola's application for a liquor license, they allegedly passed out flyers expressing opposition to the application and exhorting their neighbors to join with them in opposing it. (Am. Compl. ¶ 9(i).) These flyers are alleged to have contained thinly veiled racist statements. (*Id.*) At least one statement that allegedly appeared in the flyers—that customers would be "bused" into the neighborhood—has something of a racial cast to it, in view of our country's history of forced busing to overcome past discrimination in education. (*Id.*) Therefore, the Court can and does infer (at the pleading stage) that the Evanses opposed Lola's at least partly because of their perception

that the clientele of the establishment would be black.

Second, the Evanses joined Soho Alliance and others as plaintiffs in an Article 78 proceeding that was filed in the New York State Supreme Court, New York County, seeking to overturn the decision to grant Lola's application for a liquor license. (Am. Compl. ¶¶ 6, 7, 9(r)); *Soho Alliance v. N.Y. State Liquor Auth.*, No. 103970/05, slip op. at 9–10. They took this action on March 18, 2005. (Am. Compl. ¶ 9(r).)

The Evanses are named as defendants only in Count One of the amended complaint. They are alleged to have interfered with Plaintiffs' prospective contractual relations with the persons who would have become Lola's patrons, in violation of 42 U.S.C. § 1981.

The original complaint in this action (which named the Evanses as Defendants) was filed in August 2009. According to the returns of service entered on the docket, the Evanses were first served (with the Amended Complaint and an Amended Summons, not with the original complaint) on November 16, 2009. Both the distribution of the flyers and the commencement of the first Article 78 proceeding occurred more than four years prior to the commencement of this action using either date. The longest possible limitations period applicable to actions commenced under 42 U.S.C. § 1981 is four years. 28 U.S.C. § 1658; *see also Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 375, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004) (applying the four-year statute of limitations in § 1658 to claims under § 1981 as amended by the

Civil Rights Act of 1991). It thus appears, looking only to the face of the operative pleading, that the § 1981 claim against the Evanses is time barred.[5]

The Second Amended Complaint tries to cure this problem, although it says precious little about anything the Evanses did vis-à-vis Lola's application after March 2005. The Court has been made aware of the fact that the Evanses are also petitioners in the second Article 78 proceeding, and that this proceeding resulted in a second judicial cancellation of Lola's permit during 2007. Interestingly, the Proposed Second Amended Complaint does not mention this second Article 78 proceeding. The only new thing it alleges about the Evanses is that Marie Evans placed a "harassing ... telephone call" to "plaintiff" in September 2007, during which she threatened to "hire lawyers" and "drive Lola out of business." (Prop. S.A.C. ¶ 9(j).)

However, the Evanses do not rely on the statute of limitations. Instead, they move to dismiss the complaint on the ground that they could not possibly have interfered with any contractual relationship of Lola's. They also assert that the Plaintiffs' allegations constitute a classic instance of SLAPP-suiting, in violation of New York's anti-SLAPP provision, N.Y. Civil Rights Law §§ 70–a and 76–a, because Plaintiffs target the Evanses' own constitutionally protected activity. They seek reimbursement for their attorneys' fees as a sanction.

The Evanses' motion to dismiss is granted. Their application for relief under New York's Anti–SLAPP statute is denied.

---

**5.** Since this case involves the *creation* of contracts—as to which the understanding of the § 1981 contract clause is the same both before and after the 1991 amendment to that statute—one of my colleagues has opined that the shorter three-year statute of limitations applicable to Section 1983 claims should apply. *Nghiem v. U.S. Dep't of Veterans Affairs*, 451 F.Supp.2d 599 (S.D.N.Y.2006). I choose to give Plaintiffs the benefit of the doubt-and of the longest possible limitations period.

## A. The § 1981 Contract Claim

42 U.S.C. § 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .

To establish a § 1981 claim, a plaintiff must show (1) that he/she is a member of a racial minority; (2) that the defendant intended to discriminate against the plaintiff on the basis of race; and (3) that the plaintiff was subjected to discrimination concerning one or more of the activities enumerated in § 1981. *Lauture v. Int'l Bus. Machines*, 216 F.3d 258, 261 (2d Cir. 2000) (*citing Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085 (2d Cir.1993)).

Plaintiffs argue that Defendants interfered with their right to enter into contracts. They recognize that, "Any 1981 claim . . . must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights." (Pls.' Mem. in Opp. to Def. Evanses' Mot. Dis., dated Jan. 8, 2010, at 15 ("Pls.' Mem. Re: Evanses") (*quoting Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006)).) Section 1981(b) defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." As a result, "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's*, 546 U.S. at 476, 126 S.Ct. 1246.

The contractual relationship that Plaintiffs identify in response to the motion to dismiss are the relationships with customers that Lola's would have attracted if the Evanses' (and others') use of the legal process had not driven Lola's out of business. (Pls.' Mem. Re: Evanses at 15–16.) In other words, Plaintiffs allege that, by tying up Lola's liquor permit application until the establishment was no longer financially viable, the Evanses (together with Soho Alliance and Sweeney) interfered with Plaintiffs' ability to make contracts with the people who would have walked in the door to eat, drink and socialize—a form of interference with prospective business relations.

There are multiple infirmities with Plaintiffs' theory.

## 1. The Evanses Had No Power or Authority to Prevent Plaintiffs from Making Contracts with Customers

First and foremost, Plaintiffs cannot hold the Evanses on an interference with contract claim because they have not alleged that the Evanses prevented them from entering into contracts with potential customers (or suppliers, or entertainers)— at least, not as that term is understood in § 1981 jurisprudence.

Section 1981's right to make and enforce contracts is violated if a party refuses, on account of race, to extend to someone the same opportunity to enter into contracts as he extends to white offerees. *Runyon v. McCrary*, 427 U.S. 160, 170–71, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

In this case, there is no allegation that the Evanses themselves refused to enter into any contract with Plaintiffs. That is not Plaintiffs' theory. Nor do Plaintiffs allege that they were prevented from en-

tering into a contract with some identifiable third party.

Rather, Plaintiffs allege that they were driven out of business because they had to contend with various legal challenges to Lola's opening and continuing to operate at the Soho address. This purportedly prevented them from entering into contracts to provide food, drink and entertainment to the persons who would have been patrons of Lola's prior to its opening or since it closed—in effect, with the general public. (Pls.' Mem. Re: Evanses at 15–16.)

The fact that this case alleges interference with a contractual relationship between Plaintiffs and someone other than Defendants does not bar a claim under § 1981. In *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), the United States Supreme Court ruled that 42 U.S.C. § 1982 protects against the actions of third parties, as well as the actions of an immediately contracting party. Several Circuits, including our own, have extended this principle to contract claims under § 1981.[6] *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir.2000); *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir.1975). The Seventh Circuit has spoken particularly strongly, stating that "tortious interference with contract rights violates section 1981 when the motivation for the interference is racial." *Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir.2008); *see also Shaikh v. City of Chicago*, 341 F.3d 627, 630 (7th Cir.2003) (stating as dicta that *Faraca* extended *Sullivan* to all § 1981 contractual claims).

However, liability under § 1981 for interference with a third-party contract attaches only to persons who actually had the power or authority to prevent the plaintiffs from contracting with the third party. *Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1197 (10th Cir.2002) (requiring a demonstration "that the party both possessed sufficient authority to significantly interfere with the individual's ability to obtain contracts with third parties, and that the party actually exercised that authority to the individual's detriment"). Here, the Evanses had no power to prevent Lola's from either opening for business or obtaining a liquor license. Because that is so, no claim lies against them under § 1981.

The case most closely on point is *Shaikh*. There, plaintiff was an individual who had entered into an agreement with the Department of Housing and Urban Development (HUD) to purchase a building in Chicago, known as the Lowe apartment building, after the City declined to exercise its right of first refusal. *Id.* at 628. The City changed its mind, but HUD refused to cancel its auction and Mr. Shaikh won the right to purchase the building. *Id.* at 630. The City, which belatedly desired the property as part of a redevelopment project, urged HUD not to overlook any "technical violations" that would permit the agency to get out of its deal with Shaikh, and tried to persuade Shaikh to walk away from his contract by telling him it planned to condemn the property once the purchase had been effected. *Id.* at 629–30. Shaikh, a Muslim–American and U.S. citizen born in India, withdrew from his contract, but a subsequent sale to white buyers went through, and the City did not exercise its eminent domain power to acquire the parcel. *Id.* at 629. Shaikh then sued the City, charging

---

6. The Supreme Court itself recently has said that its precedents construe Sections 1981 and 1982 in the same manner. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 128 S.Ct. 1951, 1955, 170 L.Ed.2d 864 (2008).

that it had violated §§ 1981 and 1982 by persuading him to cancel the purchase agreement for racially motivated reasons.

The Seventh Circuit flatly stated that Chicago had engaged in conduct that it described as "inefficient[ ], irrational[ ], and for that matter impolite." *Id.* But the court concluded that Shaikh failed to state a claim under § 1981, because the City had no power to stop Shaikh from completing his contract with HUD:

> Because the City had no power directly to affect HUD's proposed sale of the property to Shaikh, it did not unlawfully or unconstitutionally impede upon Shaikh's ability to purchase the building .... The City did not own the Lowe apartment building—HUD did—and so the City could not refuse to sell it to Shaikh .... the City [also] lacked leverage over HUD to get it to break its bargain with Shaikh (although that didn't stop it from urging HUD ... not to overlook any technical violations [of the purchase agreement] by Shaikh).

*Id.* at 629–30.

The panel also rejected the theory that the City's "ominous-sounding" threats of post-purchase condemnation violated § 1981, noting that a municipality's threat to exercise its statutory authority to acquire property (in accordance with constitutional and statutory mandates and limits) could not be analogized to threats to withhold municipal services or to deny future zoning permits in an effort to prevent a purchase of property by a particular individual—the type of municipal threats at issue in cases like *Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), and *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1294 (7th Cir.1977). The court in *Shaikh* specifically noted that the public use protections of the Fifth Amendment's takings

clause, as well as a property owner's rights under the Illinois eminent domain statute, "would resolve Shaikh's concerns that the City was not motivated to take his property for the stated intention of relocating [a city college] campus but rather by unlawful, discriminatory animus." *Id.* at 632–33. And the court noted that if the City had decided to take the property after Shaikh bought it, it would have to pay plaintiff fair market value therefor. *Id.* at 633. So in the end, the City's threats did not interfere with Shaikh's ability to purchase the property—even though his fear of those threats was allegedly what caused him to back out of the deal.

There is much in *Shaikh* that is on all fours with this case, but the most notable similarity is that in this case, as in *Shaikh,* the acts allegedly ostensibly undertaken by the Evanses to interfere with the Plaintiffs' contractual (or potential contractual) rights—petitioning, passing out fliers, campaigning, threatening to hire lawyers, filing a lawsuit—were not what kept Lola's from getting its liquor license. It was the actions of the New York State Supreme Court and of the Plaintiffs themselves that kept Lola's out of business for three years. Like the City of Chicago in *Shaikh,* the Evanses had no power to prevent the SLA from granting Plaintiffs' application for a liquor license—only the SLA could do that. The Evanses tried to influence that decision (which is constitutionally protected activity regardless of motive, as will be discussed below), but their public opposition to the Plaintiffs' application for a liquor license was unsuccessful at the administrative level. One would hardly know it from reading Plaintiffs' pleadings, but every time the SLA Commissioners voted, they approved issuance of the permit for which Plaintiffs actually applied.

Once the SLA granted Plaintiffs their license, only a court of law could overturn

that decision. The Evanses joined in a petition seeking such an order, but again, they had no control over the outcome of the case. The fact that a judge ruled in the Evanses' favor is decidedly unhelpful to Plaintiffs' cause, but the relevant fact is that it was a judge—not the Evanses— who ordered the SLA to cancel the license it had issued to Plaintiffs. Absent that judge's decision, no power on earth—certainly nothing John and Linda Evans of Soho had any ability to do—could have prevented Lola's from opening its doors with a liquor license.

And the fact that the liquor license that the SLA kept issuing was not the precise license Lola's wanted or needed until mid–2008 had nothing whatever to do with the Evanses. The defective application filed on its behalf was the fault of Plaintiffs or their lawyers. The Evanses had nothing to do with the fact that it took the Plaintiffs three years to ask for what they really wanted.

Because the Evanses had no power to make the decisions that would or could interfere with Plaintiffs' ability to contract, no interference claim lies against them under Section 1981.

## 2. The Plaintiffs Fail to Identify Any Specific Contracts That the Evanses' Alleged Interference Prevented Them from Entering.

Additionally, where—as here—a plaintiff merely alleges possible loss of future opportunities with unnamed persons, rather than the loss of an identified business relationship that was the subject of interference, the plaintiff cannot maintain an action under § 1981.

As the Seventh Circuit pointed out in *Shaikh*, § 1981 claims of interference with a person's ability to contract with some third party derive from the common law tort of third—party interference with business relationships—or as we call it here in New York, prospective business advantage. 341 F.3d at 631. Under New York law, to succeed on such a claim, the plaintiff who has not already entered into a contract must allege "a particular business relationship or contract with a third party that was affected by the offending party's actions." *White v. Ivy*, 63 A.D.3d 1236, 1238, 880 N.Y.S.2d 374 (3d Dep't 2009) (*citing Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189–190, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004)). Dismissing a complaint that pleaded tortious interference with prospective business relations—which is the essence of Plaintiffs' § 1981 claim—the First Department identified the plaintiff's fatal error as "failure to allege *any specific prospective relationship* with which defendants interfered." *Bus. Networks of N.Y., Inc. v. Complete Network Solutions Inc.*, 265 A.D.2d 194, 195, 696 N.Y.S.2d 433 (1st Dep't 1999) (emphasis added) (*citing Korn v. Princz*, 226 A.D.2d 278, 278–79, 641 N.Y.S.2d 283 (1st Dep't 1996)).

While the parties have not cited any Second Circuit case directly on point, other circuits have held that no claim lies under § 1981's "making and enforcing of contracts" clause for what Plaintiffs here claim—interference with their ability to serve the public generally, rather than with some specific prospective business relationship.

The seminal case is *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1267–68 (10th Cir.1989), where the plaintiff, an attorney, alleged that his local newspaper published false information about him because he represented black persons. Insofar as his lawsuit was premised on § 1981, the attorney asserted that these libelous or misleading statements interfered with his prospective opportunity to obtain client business from unspecified persons, because they cast him in an unflattering light. *Id.*

at 1267. Although the plaintiff's race (he was white) did not bar him from bringing suit under § 1981, *see McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 287, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)[7], the Tenth Circuit concluded that the attorney had failed to allege that he was deprived of an interest protected by § 1981:

> [P]laintiff here merely alleges possible loss of future [business] opportunities .... [B]ut we find that vague and conclusory allegation insufficient to state a deprivation of the right to make and enforce contracts that is protected by Section 1981. Plaintiff has the same right as others to enter into contracts with those who wish to contract with him. Even if the [paper] has defamed him and thus arguably made him less attractive to some who otherwise might want to contract with him, the defamation does not deny him the basic right to contract.

*Phelps,* 886 F.2d at 1267 (original emphasis omitted).

A similar result was reached by the Seventh Circuit, albeit on radically different facts, in *Morris v. Office Max, Inc.,* 89 F.3d 411 (7th Cir.1996). In *Morris,* which has overtones of this case, two African-American men sued Office Max under § 1981 because they were approached by police officers, allegedly because they were "acting suspiciously," but in plaintiffs' view, simply and solely because they were black. *Id.* at 411. The district court held that the plaintiffs failed to allege that any discrimination they had experienced concerned the making and enforcing of a contract, because they were denied neither admittance nor service at the store, nor were they asked to leave. Plaintiffs also produced no evidence that they were pre-

vented from purchasing any product. The Seventh Circuit affirmed, since a claim under § 1981 had to "allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities." *Id.* at 414–15 (*citing Phelps* ).

And in *Green v. State Bar of Texas,* 27 F.3d 1083 (5th Cir.1994), an African-American insurance adjuster, who had been enjoined from practicing law without a license, sued various insurance companies under, inter alia, § 1981. He alleged that State Farm Insurance Company refused, because of his race, to honor his contracts with his clients to negotiate settlements on their behalf. *Id.* at 1086. The Fifth Circuit, affirming the district court's dismissal of that claim, concluded that the adjuster had failed to allege either that State Farm refused to contract with him or that State Farm "somehow impeded his right to enforce a contract in either the courts or nonjudicial avenues." *Id.* Admittedly, *Green* would be of limited precedential value in many contexts because the Fifth Circuit did indicate that it was applying the definition of "making and enforcing contracts" as explained by the United States Supreme Court in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)—a case that was statutorily overruled by Congress. Section 1981(b), *amended by* Civil Rights Act of 1991, Pub.L. No. 102–166 § 101(2), 105 Stat. 1071, 1072. However, in the context of this case, *Green* remains a useful precedent, because the Plaintiffs here specifically allege that they were prevented from entering into contracts with prospective customers—and entering into contracts fell squarely within the proscription of § 1981 both before and after the 1991 amendment.

---

**7.** The Evanses' argument that Plaintiff Odeen cannot invoke § 1981 because he is white is plainly wrong, as is their contention that

Ginx, as a corporation, cannot properly invoke the statute. (Pls.' Mem. Re: Evanses at 16–18.)

Plaintiffs cite the Supreme Court's decision in *Runyon* for the proposition that a cause of action lies under § 1981 where a plaintiff is prevented from entering into a contractual relationship with a third party due to racially motivated interference. (Pls. Mem. Re: Evanses at 16.) The facts in *Runyon* are well known—and totally dissimilar to those at bar. In *Runyon*, private, commercially-operated, nonsectarian schools refused to enroll students because they were African–American. *Id.* at 165, 96 S.Ct. 2586. In pertinent part, the Supreme Court held that this form of racial discrimination amounted to a "classic violation of Section 1981"; the children's parents sought to enter into a contract with the schools but were not given the same opportunity to do so as white persons were. *Id.* at 172, 96 S.Ct. 2586.

*Runyon* involved neither interference with "prospective business advantage" nor potential contractual opportunities with unidentified persons who were not parties to the lawsuit. The Supreme Court did not even discuss third-party interference with contract; the schools that refused to contract with the plaintiffs were named as parties defendant.

Plaintiffs also rely on the decision of my esteemed colleague, Judge Patterson, in *Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 2000 WL 896929, at *11–12 (S.D.N.Y. July 6, 2000), to support their contention that a claim exists under § 1981's contracts clause where the complaint alleges that plaintiffs were prevented from entering into a contractual rela-tionship with a third party due to racially motivated interference. In that case, Judge Patterson denied a motion to dismiss a § 1981 complaint brought by five African–American concert promoters, who alleged that certain white-controlled booking agencies and concert promoters blocked their ability to promote concerts. *Id.* Their amended complaint alleged that the plaintiffs were excluded from co-promotion opportunities and from bidding on contracts to promote specific, identifiable tours by well-known artists. The fact that those artists were not named as defendants in the action did not mean that the contractual opportunities that were the subject of the lawsuit were not specifically identified. *Id.*

*Rowe* clearly holds that a plaintiff can state a § 1981 claim by asserting that he was prevented by the defendant from contracting with identifiable third parties who are not defendants in the action—a proposition this Court does not dispute.[8] But its holding is in complete accord with the principle that particular and specific business opportunities must be identified before a claim for third-party interference can be stated.

Because the plaintiffs have not identified any specific contract that the Evanses prevented them from making, their § 1981 claim must be dismissed.

### 3. Regardless of the Evanses' Motives, Their Actions Were Constitutional, So Section 1981 Is Not Implicated.

■ Plaintiffs allege that the Evanses ought to be liable under § 1981 for inter-

8. The Evanses' references to the final outcome of the protracted *Rowe* case—in which it was ultimately held that the plaintiffs had failed to produce any evidence to support their Section 1981 claim, *Rowe Entm't v. William Morris Agency, Inc.*, 2005 WL 22833 (S.D.N.Y. Jan. 5, 2005), *aff'd* 167 Fed.Appx. 227 (2d Cir.2005)—are of no moment, since the standard a plaintiff must meet to defeat a motion for summary judgment is vastly different than the standard on a motion to dismiss. For our purposes, all that is relevant is that *Rowe* held that the plaintiffs' allegations were sufficient at the pleadings stage, and that those allegations included claims that plaintiffs were prevented from entering into contracts with certain specified third parties.

**363**

fering with their business prospects because they petitioned the SLA and filed the Article 78 proceeding for an improper (i.e., racially motivated) purpose. However, what the Evanses did is constitutionally protected: they, like every citizen, have a right to petition the Government, even if their motive is despicable.

The First Amendment right to petition the government is essentially an absolute privilege because it is "core political speech." *Meyer v. Grant*, 486 U.S. 414, 421–22, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). Only in the rarest instances will the right of petition be circumscribed because of the speaker's motive. As a unanimous Supreme Court stated in *City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation*, 538 U.S. 188, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003):

> Our well established First Amendment admonition that "government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable" ... dovetails with the notion that all citizens, regardless of the content of their ideas, have the right to petition their government.

*Id.* at 196, 123 S.Ct. 1389 (internal citations omitted).

■ The right of petition extends to all departments of the Government, including administrative agencies. *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The Evanses' expression of opposition to Plaintiffs' application for a liquor license before the SLA, and their participation in organizing community protest against issuance of the license, represent classic instances of the right of petition. The Evanses' exercise of that right before the SLA cannot be attacked via § 1981, regardless of their motive.

The question is whether the same can be said of the filing of the Article 78 proceedings.

The right of petition includes "right of access to the courts." *Cal. Motor Transport*, 404 U.S. at 510, 92 S.Ct. 609. However, "not every lawsuit is entitled to the same degree of First Amendment protection"—in particular, litigation that is baseless is not protected. *Mosdos Chofetz Chaim, Inc. v. Village Of Wesley Hills*, 701 F.Supp.2d 568, 593 (S.D.N.Y.2010) (*citing, inter alia, BE & K Constr. Co. v. Nat'l Labor Relations Bd.*, 536 U.S. 516, 530–33, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002); *Bill Johnson's Rests. Inc. v. Nat'l Labor Relations Bd.*, 461 U.S. 731, 743, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983)). As long as the litigation is not baseless, however, "overtones of discriminatory animus" in bringing a lawsuit do not "strip away the speaker's First Amendment rights." *Mosdos Chofetz*, at 600 (citing *Creek v. Vill. of Westhaven*, 80 F.3d 186, 192 (7th Cir. 1996)).

■ Under this doctrine-first developed in the context of antitrust litigation, where it is known as the *Noerr–Pennington* doctrine,[9] and later extended to other areas of law-a party's right to file a lawsuit without liability is unimpeachable unless the suit is a "sham," meaning "objectively baseless." Only if a lawsuit is so utterly devoid of merit as to qualify as "objectively baseless" does the filing party's subjective motive for commencing the action become relevant. *Prof'l Real Estate Investors Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).

**9.** *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

The first question is whether *Noerr–Pennington* applies in the context of civil rights litigation, a question that is not firmly settled in this Circuit. District courts have reached inconsistent results, compare *Weiss v. Willow Tree Civic Ass'n,* 467 F.Supp. 803, 818–19 (S.D.N.Y.1979), with *LeBlanc–Sternberg v. Fletcher,* 781 F.Supp. 261, 267 (S.D.N.Y.1991). And the Second Circuit has not squarely addressed the issue.

However, in a recent opinion, my colleague, the Hon. Kenneth Karas, concluded—after a thorough and scholarly review of the relevant jurisprudence—that *Noerr–Pennington* analysis did apply in the civil rights context and could be used to bar a suit like this one.

In *Mosdos Chofetz,* various Orthodox Jewish groups and individuals served several Rockland County municipalities, charging, inter alia, that the villages had initiated an Article 78 proceeding for an improper discriminatory purpose. Defendants moved to dismiss, on the ground that the lawsuit qualified for First Amendment protection as protected petitionary activity. The district court agreed.

Judge Karas observed that applying *Noerr–Pennington* in the civil rights context required careful balancing, because both *Noerr–Pennington* and the civil rights statutes (in that case, §§ 1982, 1983 and 1985) protect constitutional rights.

*Id.* He cautioned that *Noerr–Pennington* "... does not grant unlimited license to those who wish, for allegedly discriminatory reasons, to exercise their right to petition." *Id.* But he concluded that *Noerr–Pennington*'s framework balanced the competing constitutional interests in the "wrongful litigation" context by limiting First Amendment protections to situations in which the challenged lawsuit was not objectively baseless:

> While the framework prescribed by *Noerr–Pennington* mirrors the First Amendment right to bring a viable lawsuit regardless of the underlying motivation, it also preserves the ability of those injured by such conduct to protect their constitutional or statutory rights *when an objectively baseless lawsuit is brought,* particularly when the lawsuit involves unlawful or discriminatory motivation. In contrast, denying such protection *to any viable lawsuit,* initiated even for allegedly improper reasons, would unnecessarily undermine First Amendment principles.

*Id.* at 597 (emphasis added). Judge Karas concluded that the defendants' success in their Article 78 proceeding was "fatal" to plaintiffs' claim that the lawsuit was "objectively baseless." *Id.* at 585. He therefore dismissed plaintiffs' civil rights challenge to that action on First Amendment grounds.[10]

---

10. Although Judge Karas dismissed the complaint in his case, he did so without prejudice, giving the plaintiffs leave to replead. However, leave to replead was the product of a critical difference between *Mosdos Chofetz* and this case. In *Mosdos Chofetz,* the defendants who filed the Article 78 proceeding were municipal actors—villages. The authority of municipalities to petition (including their authority to initiate litigation) is limited by other constitutional provisions that do not similarly apply to individuals—including the Equal Protection Clause of the Fourteenth Amendment, which bars municipal conduct of any sort that discriminates on the basis of race. *Mosdos Chofetz,* at 585, 587. In granting plaintiffs the right to replead in light of his opinion, Judge Karas gave them an opportunity to cure their failure to allege facts tending to show that the Village defendants had exercised their right to petition "selectively." *id.* Absent such allegations, however, a plaintiff's challenge to a lawsuit that was not objectively baseless will not survive. In this case, by contrast, the Plaintiffs are challenging the actions of individuals, not government. Therefore, once one concludes that the challenged litigations (the Article 78 proceed-

■ I find Judge Karas' reasoning persuasive, and so conclude that *Noerr–Pennington* analysis applies in the context of Plaintiffs' challenge to the Evanses' litigation activities. Nothing about the Article 78 proceedings brought by the Evanses (and others) can be described as a sham. The state's ABC law created a presumption that the license Plaintiffs sought should not issue, in view of the number of permitted premises in the immediate vicinity. A Justice of the New York State Supreme Court concluded that the petitioners' challenge to the SLA's unexplained decision granting a license had merit. The appellate court, while overturning the remedy imposed by the lower court judge (cancellation of the license), nonetheless agreed with the lower court that the petitioners had correctly identified a defect in the proceedings before the SLA: the Commissioners' failure to give reasons for the decision. When six judges conclude unanimously that a litigation position has merit, it is impossible to describe that position as "objectively baseless."

Therefore, the Evanses' participation in the Article 78 proceedings is constitutionally protected under the petition clause of the First Amendment, and Plaintiffs' challenge thereto must be dismissed.

### 4. The Second Amended Complaint Does Not Cure Any of the Above–Described Deficiencies

The Proposed Second Amended Complaint attempts to cure the deficiencies of the Amended Complaint by implying that the Evanses were more directly involved in actions taken by the Soho Alliance—i.e., it tries to equate the Evanses with Sweeney, who has not moved to dismiss. The Proposed Second Amended Complaint (1) adds Marie Evans's name to an allegation that Sean Sweeney "told plaintiff, via tele-

phone, that he and the Soho Alliance did not want Lola in the neighborhood" (Prop. S.A.C. ¶ 9(d)); (2) insinuates that Marie Evans is responsible for the Alliance's allegedly fraudulent padding of the list of petitioners in the original Article 78 proceeding because the additional names include her "real estate clients or acquaintances" (*id.* ¶ 9(w) n. 1); (3) alleges that Marie and John Evans confronted their neighbors in an effort to dissuade them from signing the petition in support of Lola's (*id.* ¶ 9(i), 9(1)); and (4) alleges that Marie Evans made a harassing phone call to "plaintiff" in September 2007 (*id.* ¶ 9(j), 9(r)).

Even taking these allegations in the light most favorable to Plaintiffs, they do not solve any of the problems identified above. Nothing about lobbying the neighbors not to sign a petition or telephoning one of the Plaintiffs interfered with any identifiable contract relationship so as to become actionable under § 1981. The so-called "padding" of the original list of petitioners in the Article 78 proceeding occurred outside the four-year statute of limitations. Furthermore, as long as even one petitioner in that proceeding wanted to bring it—and nothing in the Second Amended Complaint suggests that this was not the case—then the only persons who were offended by having their names listed as plaintiffs were the persons listed, not Plaintiffs.

### 5. The Evanses' Cross–Motion for SLAPP Sanctions Is Denied.

Defendants have moved, pursuant to New York Civil Rights Law §§ 70–a and 76–a, for an award of attorney's fees and costs incurred in defending this action which they estimate has cost them $76,000. The cross-motion is denied.

---

ings before Justice Shafer) were not objectively baseless, the matter is closed; the challenge

must be disallowed on constitutional grounds and the case dismissed with prejudice.

This claim for costs and attorney's fees hinges on the allegation that the § 1981 claims against the Evanses fail to meet the "substantial basis in fact and law" standard that is imposed on pleadings by New York's Anti–SLAPP law. N.Y. C.P.L.R. § 3211(g); N.Y. Civ. Rights L. § 70–a(1)(a). Defendants cite a case from the Eastern District of New York, *PGC Property, LLC v. Wainscott/Sagaponack Property Owners, Inc.*, 250 F.Supp.2d 136, 144 (2003), for the proposition that attorney's fees can be an appropriate remedy for a SLAPP suit brought on a federal claim in federal court. True, the court acknowledged that fact, but the case is unpersuasive for two reasons. First, the statement was dicta; the court denied the defendants' summary judgment motion as premature. Second, *PGC Property* is against the weight of authority.

In every other case this Court has located, federal courts have declined to apply Anti–SLAPP statutes to federal claims. As Magistrate Judge Lisa Margaret Smith held in Yeshiva *Chofetz Chaim Radin, Inc. v. Village of New Hempstead* by its Board, 98 F.Supp.2d 347, 360 (S.D.N.Y.2000), "There is no reason why a federal claim, brought in a federal court for an alleged violation of the plaintiffs' federal statutory or constitutional rights, should be subjected to different standards of pleading or proof than are called for under the Federal Rules." The learned Magistrate Judge is not alone in so concluding. Except for the Fifth and Ninth Circuits, "The general tendency of the federal courts is to consider such state statutes to be procedural in nature and thus not applicable in federal courts." Kathleen L. Daerr–Bannon, "Cause of Action: Bringing and Defending Anti–SLAPP Motions to Strike or Dismiss," 22 Causes of Action 2d 317 § 7 (2010); *see also South Middlesex Opportunity Council, Inc. v. Town of Framingham*, 2008 WL 4595369, at *8–9 (D.Mass.

Sept. 30, 2008) (summarizing federal courts' application of state anti-SLAPP statutes to federal question claims). Furthermore, both the Fifth and Ninth Circuits have only enforced state anti-SLAPP rules when state law claims find their way into federal court via diversity. *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963 (9th Cir. 1999); *Henry v. Lake Charles Am. Press*, 566 F.3d 164, 168–69 (5th Cir.2009). No federal court of which I am aware has ever awarded anti-SLAPP sanctions because of a federal claim in a federal forum.

Here, the Plaintiffs' only claim against the Evanses arose under federal law. The Defendants fail to explain why this Court should apply a state procedural rule rather than the Federal Rules of Civil Procedure. New York's legislature may have adopted the Anti–SLAPP law to elevate a plaintiff's burden at the pleading stage above "plausibility" (the post-*Twombly/Iqbal* federal standard) to "substantial basis," but the United States Congress has thus far declined to follow suit. (Defs.' Reply Brief at 8; Defs.' Mot. Dis. at 16 (*citing* CPLR § 3211(g)).) The Defendants' reference to Fed.R.Civ.P. 54, which sets forth procedures for applying for awards of attorneys fees, is not a rule of pleading, and the anti-SLAPP statute is a rule of pleading. I see no reason to apply a state law pleading standard to a federal claim brought in a federal court.

The motion for sanctions under New York Civil Rights Law §§ 70 and 76 is denied.

### CONCLUSION

The Evanses' motion to dismiss (Docket No. 7) is granted with prejudice.

The Healey motion to dismiss (Docket No. 19) is granted with prejudice.

The Clerk of the Court is instructed to remove the motions from the Court's active motion list.

This constitutes the decision and order of this Court.